318

MURRAY PUBLISHING COMPANY, INC., *Appellant*, v. GARY
MALMQUIST, ET AL, *Respondents*.

*Clifford D. Sethness* and *Graham & Dunn,* for appellant.
*David W. Gossard,* for respondents.

PER CURIAM. — Appellant Murray Publishing Company, Inc. (Murray Publishing), seeks review of a partial judgment dismissing its claim that respondents Gary Malmquist, Mark O'Keefe, and *The Best Buy News* (referred to collectively as Malmquist) tortiously interfered with a contract or business expectancy. Following a 2-day bench trial, the trial court determined that Malmquist had knowingly interfered with Murray Publishing's exclusive distribution contract with Advo Systems, Inc. (Advo), a direct mailing service.[1] Malmquist has not challenged this determination. The trial court further found, however, that the exclusive provisions of the contract constituted an unreasonable restraint of trade under RCW 19.86.030 and .040 and that Murray Publishing's business expectancy arising from those provisions was therefore unenforceable.

The trial court entered a final judgment on the tortious interference claim pursuant to CR 54(b) on November 15, 1991; findings of fact and conclusions of law were entered on the same date. A commissioner granted Murray Publishing's motion for accelerated review pursuant to RAP 18.12. We now reverse.

Most of the relevant facts are undisputed. In 1982, Murray Publishing entered into a contract with Advo Systems, Inc., a national direct mail service with headquarters in

---

[1]Advo is not a party to these proceedings.

Connecticut. Much of Advo's business involved the mailing of "single-signature" (single-sig) advertisements, *i.e.*, one advertiser per sheet of paper. Murray Publishing focused on "multiple-signature" (multi-sig) advertisements, in which more than one advertiser purchased space on a piece of paper. Murray Publishing's multi-sig advertising appeared in a weekly community news and shopper newspaper called the *Argus Weekend.*

Pursuant to the contract, Advo was granted the exclusive right to solicit all local single-sig advertisements. Murray Publishing retained the exclusive right to solicit all local multi-sig advertising for placement in the *Argus Weekend.* Each week, Murray Publishing printed the *Argus Weekend* and delivered it to Advo. Advo would then insert the *Argus Weekend* into its packet of single-sig ads and prepare the packet for bulk-rate mailing to the target zip code zones.

Advo and Murray Publishing have the ability to offer advertisers delivery to all households in a selected zone, usually determined by zip codes. Because numerous advertising pieces are combined in the Advo packet, the mailing costs are spread among many advertisers, lowering the cost to each. In terms of market coverage, direct mail has certain advantages over other types of advertising because it ensures that an advertisement reaches every household in a specific area.

The 1982 contract provided for an initial 5-year term; it was extended for an additional 5 years in June 1987. As of October 1991, the *Argus Weekend* was distributed to approximately 420,000 households weekly in Pierce and King Counties.

Prior to October 1991, Advo distributed only a few items that violated Murray Publishing's exclusive multi-sig provision. Most of the exceptions were multi-sig advertisements prepared by Advo itself; these were not in competition with the *Argus Weekend,* however, because they contained primarily national advertisers.

Respondent Gary Malmquist, defendant below, was employed by Murray Publishing as an advertising salesman

for the *Argus Weekend* from 1981 to October 1991. Malmquist, who was paid by commission, was in charge of the Food Giant account, which was the primary advertiser and source of revenue for the *Argus Weekend.* Malmquist knew of the exclusive distribution provisions of the Advo-Murray Publishing contract.

By early October 1991, Malmquist had decided to leave Murray Publishing to establish a multi-sig advertising publication that would compete directly with the *Argus Weekend.* Malmquist and another *Argus Weekend* employee left Murray Publishing on October 14, 1991. At about the same time, Malmquist reached an agreement with Food Giant to drop its advertisements from *Argus Weekend* and place them with Malmquist's new publication, which he called *The Best Buy News.* Malmquist then reached an agreement with Advo to distribute *The Best Buy News* in Advo's weekly packet of advertising that previously had contained the *Argus Weekend.*

Thomas Haley, President of Murray Publishing, testified that Murray Publishing had made every effort to enforce the exclusive arrangement with Advo whenever someone discovered a violation. Haley was not aware of any local competitor, other than Malmquist, who was distributing direct mail multi-sig advertising.

Malmquist testified that he believed the arrangement with Advo was exclusive until about 1988. At that time, Advo began distributing competing multi-sig publications, and Malmquist believed "this exclusive business was over with." Malmquist testified that anyone could use the numerous direct mail houses in the area to send out direct mail advertising, but that it would be necessary to spread the mailing costs over several advertisers in order to match Advo's mailing costs. According to Malmquist, it would be "extremely difficult" for anyone to gather sufficient advertisers in the local area to compete with Advo.

On October 23, 1991, Murray Publishing filed the instant action against Malmquist and *The Best Buy News*, raising

claims of tortious interference with a contractual relationship, breach of the duty of loyalty, and breach of obligations in the employee handbook. On October 28, 1991, a temporary restraining order was entered on the tortious interference claim, prohibiting Malmquist from delivering *The Best Buy News* to Advo for distribution. Following brief discovery, the preliminary injunction hearing was consolidated with a bench trial on the merits of the tortious interference claim on October 30 through 31, 1991.[2]

Following a 2-day trial, the trial court determined that Malmquist had knowingly interfered with Murray Publishing's exclusive contract or business expectancy with Advo, causing a severe crippling of the *Argus Weekend*, including the loss of employment for the majority of its employees, a 90 percent reduction in advertising revenues, and a 90 percent reduction in circulation. The trial court found, however, that Malmquist had sustained his burden, as an affirmative defense, of proving an unlawful restraint of trade under RCW 19.86.030 and RCW 19.86.040 and that Murray Publishing therefore "had no legitimate business expectancy with which [Malmquist] knowingly interfered." The trial court dissolved the temporary restraining order and entered a judgment denying Murray Publishing's tortious interference claim. Murray Publishing appeals from this determination.

The trial court's determination that Murray Publishing's exclusive contract with Advo was an illegal restraint of trade in violation of RCW 19.86.030 rests on the following findings of fact, all of which are challenged by Murray Publishing on appeal:

15. The relevant market here is for local advertisers in retail goods or services who would seek to reach consumers in relatively small areas or a number of small areas. They would want to reach every household rather than an elite or specialized market.

---

[2]Murray Publishing's remaining claims against Malmquist are set for trial in June 1993.

16. Evidence is lacking on the subject of the various types of businesses who make up this market or their characteristics. All that is known from the trial record is that retailers such as the Food Giant stores, an automotive brake and alignment shop, Jack Roberts Appliances, Fantastic Sam's hairstylists, and John L. Scott Realtors are examples of such businesses.

17. While detailed analysis of this market is not available, it appears not to be necessary because the effects of the restraint are so obvious. Here the impact is total. Advertisers do not have a practical alternative to plaintiff's exclusive contract or monopoly. The evidence indicates that there is no one other than Advo which offers this service to advertisers. Many direct mail houses exist, but no one else like Advo draws enough advertisers to make feasible the cost of the U.S. Mail.

18. One of the exceptions to the exclusive operation of plaintiff's contract indicates this impact. In 1988 someone put together advertising for various businesses located in the Federal Way Shopping Mall and Advo mailed it out in the appropriate zones. Murray Publishing complained to Advo that this violated the agreement. Advo then instructed the person placing this advertising that they would henceforth have to place it through Murray Publishing. This was done. Murray Publishing took a fee of $500, turned around and handed the package to Advo for mailing. The Federal Way advertisers had no alternative and they paid a premium solely because of Murray Publishing's monopoly.

19. Some restraints of trade may have the potential for both enhancing and restricting competition. While no evidence was offered and no argument made on this issue, the facts appear inconsistent with any pro-competitive effect of the subject agreement, and none is found.

■ Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether the findings of fact are supported by substantial evidence and, if so, whether the findings support the conclusions of law and judgment. *Tacoma v. State*, 117 Wn.2d 348, 361, 816 P.2d 7 (1991).

■ RCW 19.86.030, part of the Washington Consumer Protection Act (CPA), provides:

Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful.

The CPA was enacted in 1961 "to promote free competition in the marketplace for the ultimate benefit of the consumer."

*State v. Black*, 100 Wn.2d 793, 799, 676 P.2d 963 (1984); *Sheppard v. Blackstock Lumber Co.*, 85 Wn.2d 929, 540 P.2d 1373 (1975). RCW 19.86.030 is essentially identical to section 1 of the Sherman Act, 15 U.S.C. § 1. *See State v. Black*, *supra*. In construing RCW 19.86.030, courts are to be guided by federal decisions interpreting comparable federal provisions. RCW 19.86.920; *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 54, 738 P.2d 665 (1987); *Ballo v. James S. Black Co.*, 39 Wn. App. 21, 26, 692 P.2d 182 (1984).

■ Every combination or contract between entities operates to restrain trade or foreclose opportunities in some sense.[3] Consequently, not all combinations or contracts that restrain trade are prohibited under section 1 of the Sherman Act. Rather, section 1 of the Sherman Act was intended to prohibit only conduct that *unreasonably* restrains trade. *Business Elec. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 99 L. Ed. 2d 808, 108 S. Ct. 1515, *cert. denied*, 108 S. Ct. 1727 (1988); *see Ballo v. James S. Black Co.*, *supra*.

The prevailing standard for determining the reasonableness of any restraint of trade is the "rule of reason" analysis. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977). Under this analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, *supra*.[4]

---

[3]"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Board of Trade v. United States*, 246 U.S. 231, 238, 62 L. Ed. 683, 38 S. Ct. 242 (1918).

[4]There is no contention here that Murray Publishing's contract with Advo constituted a per se unreasonable restraint. The per se rule is applied when a practice "facially appears to be one that would always or almost always tend to restrict competition and decrease output . . .". *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979). Such restraint, which generally involves price fixing, division of markets, group boycotts, or "tying arrangements", is presumed to be unreasonable without inquiry into the specific market context. *NCAA v. Board of Regents*, 468 U.S. 85, 100, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984); *see Ballo v. James S. Black Co.*, *supra* at 26.

The specific considerations underlying a rule of reason analysis vary according to the type of conduct at issue. In each case, however, a section 1 claimant must establish that the challenged practice results in an actual injury to competition. *Oltz v. St. Peter's Comm'ty Hosp.*, 861 F.2d 1440 (9th Cir. 1988). After reviewing the record, we conclude that Malmquist has failed to sustain this burden here.

■■ In order to show actual injury to competition, an antitrust claimant must generally present evidence delineating the "relevant market" and demonstrating the effects of the challenged conduct upon competition within that market. *Oltz*, at 1446; *Ballo v. James S. Black Co.*, *supra* at 28. The "relevant market" includes both the geographic market, *i.e.*, the area of effective competition within which buyers can turn for alternative sources of supply, and the product market, which includes product use, quality, and description. *Oltz*, at 1446. The relevant product market encompasses "all products that are 'reasonably interchangeable,' and so can be said to compete with each other for the same buyers' dollars . . .". *General Business Sys. v. North Am. Philips Corp.*, 699 F.2d 965, 972 (9th Cir. 1983); *see also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989); *Oltz*, at 1446 (product market is "pool of goods or services" that qualify as economic substitutes because they "enjoy reasonable interchangeability of use and cross-elasticity of demand."). Thus, in order to define the relevant product market, Malmquist was required to present evidence regarding competitors with the actual or *potential* ability "to deprive each other of significant levels of business." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991).

■ The "product" or "service" that Murray Publishing offered was local multiple-signature direct mail advertisements that could be delivered, through Advo, to every household in selected zip code "zones" in King and Pierce Counties. In challenged finding of fact 15, the trial court found that the "relevant market" was for "local advertisers in retail goods or services who would seek to reach con-

sumers in relatively small areas or a number of small areas. They would want to reach every household rather than an elite or specialized market." Such businesses are not potential competitors, however, but rather are the *consumers* for Murray Publishing's multi-sig advertising services. *See Morgan, Strand.*

There was no evidence presented, and no findings made, regarding competing advertising media, including television, radio, metropolitan newspapers, local newspapers, hand-delivered flyers, and other direct mail services, of which there are many in the relevant geographical area. The reasonable interchangeability of supply is a significant element of the product market definition because "the existence of possible competitors constrains prices even where there is no direct competition." *General Business Sys. v. North Am. Philips Corp., supra* at 974 n.2. The mere fact that competing advertising media may be more expensive does not govern the scope of the relevant market. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975); *see also Telex Corp. v. International Business Machs. Corp.*, 510 F.2d 894 (10th Cir. 1975) (absolute identity of products not prerequisite to potential substitutability).

Additional information regarding the nature of the local businesses that utilize multi-sig local advertising was also required for an analysis of the relevant market here. The trial court conceded the absence of evidence, other than the names of several businesses, on this point. Finding of fact 16. Without evidence of the nature of these businesses, their advertising needs, and their requirements for direct mail advertisements, however, there is no way to assess the effect of Murray Publishing's contract on advertising supply and demand and, consequently, on competition.

Malmquist seems to argue that the existence of competing advertising media is irrelevant because this case involves only businesses who wish to advertise in a publication like the *Argus Weekend* and there are no alternatives to Murray Publishing and Advo. This appears to be an attempt to

define the "relevant market" very narrowly. However, Malmquist has not presented sufficient evidence to carve out such a narrow product market definition.

■ Under certain circumstances, the relevant product market may be defined narrowly as a submarket that is delineated by "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 8 L. Ed. 2d 510, 82 S. Ct. 1052 (1962); *General Business Sys. v. North Am. Philips Corp.*, *supra* at 972; *Thurman*, at 1369 (claimant failed to establish submarket for "one stop" home centers). Here, the record is essentially silent with regard to these considerations and therefore does not permit identification of a submarket for multi-sig direct mail advertising. *See Morgan*, *Strand*, at 1490; *Thurman*, at 1375.[5]

■ Malmquist next argues, and the trial court agreed, that an elaborate market analysis is unnecessary because Murray Publishing has a "monopoly" on multi-sig advertisements and the effect of the restraint on competition is therefore obvious. The need to present substantial evidence of the relevant market can be avoided if the claimant can establish "actual detrimental effects on competition such as output decreases or price increases caused by the restraint." *Thurman*, at 1373. No such showing was made here.

Malmquist relies heavily on finding of fact 17, which provides:

> While detailed analysis of this market is not available, it appears not to be necessary because the effects of the restraint are so obvious. Here the impact is total. Advertisers do not have a practical alternative to plaintiff's exclusive contract or monopoly. The evidence indicates that there is no one other than Advo which offers this service to advertisers. Many direct

---

[5]"Without a showing of the role that industry and public perception, distinct customers, or specialized vendors play in motivating and shaping consumer decisions, the demarcation of a submarket from within the pool of producers and sellers who supply economic substitutes cannot be justified." *Thurman*, at 1376.

mail houses exist, but no one else like Advo draws enough advertisers to make feasible the cost of the U.S. Mail.

What is "feasible" or what constitutes a "practical alternative" in an economic sense cannot be assessed in a vacuum. The only evidence supporting this finding was Malmquist's testimony that the numerous competing direct mail houses would charge $120 per thousand pieces, whereas Advo, because of its existing base of national advertisers, could add the same pieces to its weekly packet for $20 to $25 per thousand pieces. A comparison of raw mailing costs is meaningless, however, unless there also is evidence indicating how these costs affect the ultimate desirability and cost of advertising space in a multi-sig direct mail publication. Malmquist presented no evidence regarding Murray Publishing's ability to raise prices above competitive levels or the sensitivity of potential advertisers to price increases resulting from Murray Publishing's alleged market power.

Given the lack of evidence regarding possible competitors and the nature of the direct mail advertisers, the record does not support the trial court's conclusory determination that the impact of the restraint is "obvious" and "total". Because the record does not support a finding of a clear competitive injury resulting from Murray Publishing's contract, Malmquist was required to present a detailed market analysis in order to demonstrate the effects of the challenged contract on competition. *Thurman*, at 1373.

■ Nor does the fact that the *Argus Weekend* was the sole supplier of direct mail multi-sig advertisements in the relevant geographical area, standing alone, constitute a restraint of trade. In order to demonstrate an injury to competition under such circumstances, Malmquist was also required to show the existence of significant entry barriers to potential competitors. *Morgan, Strand.* The sole evidence of entry barriers was Malmquist's testimony regarding raw mailing costs and the assertion that it would be "difficult" for a competitor to put together sufficient advertisers to make the cost of using another direct mail house comparable to Advo. Malmquist presented no cost estimates, potential rates of return,

or other financial data regarding the feasibility of launching a competitor to the *Argus Weekend* through another direct mail service. He conceded, however, that

> There's probably 20 mail houses out there, all capable of mass mailing to the greater Puget Sound area. The problem is that you have to get five to six advertisers put together in every zip code to make it profitable.

Report of Proceedings, at 214-15. Given such undisputed evidence of numerous other direct mail houses, the conclusory assertion that starting a competing publication would be "difficult" or a "problem" is insufficient to establish a significant entry barrier to competition. *See Morgan, Strand* (because evidence did not permit comparing potential competitors' costs or expected rates of return, trier of fact could not reasonably have found significant entry barrier).

■ Malmquist's arguments also imply that the Washington CPA guarantees him legal access to Advo's single-sig advertising base. In *Determined Prods., Inc. v. R. Dakin & Co.*, 514 F. Supp. 645 (N.D. Cal. 1979), *aff'd*, 649 F.2d 866 (9th Cir. 1981), the court rejected a similar implication. In *Determined Prods.*, the plaintiff, a toy marketer, sued the defendant, a competing toy marketer, arguing that the defendant's exclusive contract with a Korean toy manufacturer constituted a violation of section 1 of the Sherman Act. In granting summary judgment in favor of the defendant, the court noted that any anticompetitive inference arising from the defendant's exclusive arrangement was negated by the undisputed evidence of alternative sources of supply, although such manufacturers would require training and supervision in order to overcome "financial and quality problems" to become competitive suppliers. *Determined Prods.*, at 648. The court then rejected the plaintiff's assertion that because the defendant "has succeeded in tying up the best, most efficient and cheapest source of supply in Korea", the arrangement constituted an antitrust violation:

> Implicit in plaintiffs' position appears to be the claim that the antitrust laws require a firm to share with its competitors the fruits of its superior acumen and industry. This is a novel

doctrine which, if accepted, would undermine the purpose of the antitrust laws which is to protect competition, not competitors.

*Determined Prods.,* at 648.

In summary, because the record contains insufficient evidence identifying the relevant market and demonstrating the effect of Murray Publishing's contract on competition or potential competition within that market, Malmquist has failed to sustain his burden of establishing an actual injury to competition. Consequently, the trial court's determination that the contract violated RCW 19.86.030 cannot stand. *See Thurman* (plaintiff failed to demonstrate relevant product market of a competing "home center" store for purposes of establishing antitrust liability); *Morgan, Strand* (radiologists presented insufficient evidence to establish relevant market for purposes of challenging hospital's exclusive service contract with a competing group of radiologists).[6]

█ The trial court also found that Murray Publishing's contract violated RCW 19.86.040, which prohibits monopolization and attempts to monopolize. However, a successful claimant under RCW 19.86.040 must also show an unreasonable restraint on competition. *See Long v. Chiropractic Soc'y,* 93 Wn.2d 757, 613 P.2d 124 (1980). Because Malmquist failed to establish an actual injury to competition under RCW 19.86.030, his claim under RCW 19.86.040 fails for the same reason.

The trial court's determination that the contract between Murray Publishing and Advo constituted an unlawful restraint of trade is reversed; the matter is remanded for further proceedings consistent with this opinion.

Review denied at 120 Wn.2d 1010 (1992).

---

[6]Because Malmquist failed to establish an actual injury to competition, it is unnecessary to consider the pro- and anticompetitive effects of the contract. *See Thurman,* at 1373.