**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 27 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CABELA'S WHOLESALE INC, Plaintiff - Appellant, v. HAWKS PRAIRIE INVESTMENT LLC, Defendant - Appellee. | No. 14-35157 D.C. No. 3:11-cv-05973-RBL MEMORANDUM* |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge,
Presiding

Argued and Submitted July 5, 2016
Seattle, Washington

Before: KLEINFELD, TASHIMA, and M. SMITH, Circuit Judges.

Cabela's Wholesale Inc. appeals the district court's grant of summary

judgment for Hawks Prairie Investment LLC on its counterclaim for breach of

contract. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

---

\*      This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

In 2005, Hawks Prairie bought the Lacey Gateway Property, 240 acres of land in Lacey, Washington, for commercial development.  It secured Cabela's as an anchor tenant for Lacey Gateway in 2006, by providing Cabela's with 27 acres of land for ten dollars and $5 million payable when Cabela's opened a 165,000 square foot store within one year of closing on the real estate.

Hawks Prairie and Cabela's agreed that Cabela's would continue to operate its Lacey store for at least 12 years, and that for 5 years after its Lacey store opened, Cabela's would not open another store within 12 designated counties in Western Washington.  Hawks Prairie agreed to start construction on 1,000,000 square-feet of commercial development within 10 years, with 6- and 8-year milestone requirements, and a "commercially reasonable, best efforts" goal for the first 4 years.

Paragraph 6 of the agreement provided that if Cabela's breached the 12-year operating requirement, Hawks Prairie had the right to a refund of the $5 million, and either (1) the then-fair market value of the 27 acres, or (2) a sixty-day option to purchase the 27 acres and improvement at fair market value, minus the then-fair market value of the 27 acres.  Paragraph 8 provided that if Cabela's opened another

store within the 12 counties of Western Washington within 5 years, Hawks Prairie was entitled to an injunction and consequential damages (not at issue in this case), refund of the $5 million, and "the right to terminate and repossess the real property as set forth above in Paragraph 6."

Cabela's completed the Lacey Cabela's within one year as promised, in November 2007. During the next four years, Hawks Prairie did not break ground on any of the other Lacey Gateway Property. In August 2010, Hawks Prairie filed for Chapter 11 bankruptcy to stave off a foreclosure sale by its primary lender, HomeStreet Bank. The contract does not have a bankruptcy clause.

Hawks Prairie's reorganization plan was approved in June 2011, and Cabela's filed this declaratory judgment action in November 2011, seeking a declaration that the restriction on opening another store in the 12-county region was not enforceable because Hawks Prairie had repudiated the contract by not further developing the property near its store. In Cabela's complaint, Cabela's said that it was ready to open another store in Western Washington in September 2012, three months before the expiration of the 12-county restriction.

3

Meanwhile, Hawks Prairie and its lender, HomeStreet, reached a settlement agreement in which Hawks Prairie agreed to sell the Lacey Gateway Property to HomeStreet, transferring all rights, title, and interest in the property to HomeStreet, except the Cabela's contract, which was reserved to Hawks Prairie for purposes of litigating this matter. The bankruptcy court approved the settlement agreement and the sale on April 18, 2012, and the bill of sale was signed by both parties on April 25. On April 19, before the bill of sale to the bank was executed, Cabela's opened a store in Tulalip, Washington. Tulalip is in the 12-county Western Washington region, and the store was opened before the five-year bar expired.

Hawks Prairie amended its answer in this case, asserting a counterclaim for breach of the 12-county restriction, seeking refund of the $5 million it had paid Cabela's, and seeking payment of the then-fair market value of the 27 acres it had conveyed to Cabela's. The district court granted summary judgment for Hawks Prairie, and entered a final amended judgment amount of $15,685,066.39 against Cabela's. That amount consisted of refund of the $5 million, the fair market value of the 27 acres, which a jury determined was $8,624,541.66, and attorney's fees and costs.

1.     The 12-county restriction was a contractual right enforceable by Hawks Prairie as an original party to the contract.  See Dickson v. Kates, 133 P.3d 498, 503 (Wash. Ct. App. 2006); see also 17 William B. Stoebuck & John W. Weaver, Washington Practice Series § 3.2 (2d ed. 2016) ("If one of the original parties seeks to enforce the covenant against the other original party, there is no 'running' involved, since neither party is a successor to himself. . . . Enforcement between the original parties is a matter of the law of contract . . . .").  The contract created the rights between Hawks Prairie and Cabela's, and Hawks Prairie expressly retained the contract after the sale of the Lacey Gateway Property to HomeStreet during bankruptcy.  The agreements about whether the geographic restriction is a covenant running with the land does not matter in these facts.

2.     The 12-county restriction was not an unreasonable restraint on trade, because it did not violate public policy.  See Colby v. McLaughlin, 310 P.2d 527, 529 (Wash. 1957).  The 12-county building restriction did not create a monopoly or enhance prices, id., and it did not violate Washington's Consumer Protection Act, as either a per se unreasonable restraint or by resulting in an "actual injury to competition."  See Murray Pub. Co. v. Malmquist, 832 P.2d 493, 497 (Wash. Ct. App. 1992).

5

3.      Hawks Prairie never "distinctly" or "unequivocally" indicated that it would not or could not perform its own construction obligations, so it did not repudiate the contract before Cabela's concededly breached the 12-county restriction on April 19, 2012.  In order for repudiation to occur, one party to a bilateral contract must "either expressly or impliedly repudiate[] the contract prior to the time for performance," either by "a positive statement or action . . . indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations."  Lovric v. Dunatov, 567 P.2d 678, 682 (Wash. Ct. App. 1977) (internal citations and quotation marks omitted).

Though Hawks Prairie had not developed any of the Lacey Gateway Property prior to filing for bankruptcy, less than four years had elapsed for its own construction obligations, and it still had over six years to meet its target.  Cabela's emphasizes that it had not broken ground on any other development, but it had not promised to do so.  It did not repudiate the 6-, 8-, and 10-year milestones.  When Hawks Prairie filed for Chapter 11 bankruptcy, it did not mention the Cabela's contract as an executory contract, presumptively letting it ride through its bankruptcy.  See Smith v. Hill, 317 F.2d 539, 542 n.6 (9th Cir. 1963).  This was not a breach of the contract as a matter of bankruptcy law.  Even if the sale to

6

HomeStreet could have constituted a repudiation, which is neither clear nor unequivocal, Cabela's breached the 12-county restriction six days before the sale to HomeStreet closed. Because Hawks Prairie did not repudiate, Cabela's performance was not excused, cf. Turner v. Gunderson, 807 P.2d 370, 375 (Wash. Ct. App. 1991), and it breached the contract when the Tulalip Cabela's opened on April 19, 2012, before the five-year restriction ended.

4.     As a result of Cabela's breach of the 12-county restriction, Hawks Prairie was entitled to damages. Paragraph 8 provided Hawks Prairie "the right to terminate and repossess the real property as set forth above in Paragraph 6" in the event Cabela's breached the 12-county restriction. The phrase "terminate and repossess" by itself, without context, is confusing, since it suggests ending a leasehold or perhaps foreclosing on a security interest, neither of which Hawks Prairie had. Paragraph 6, though, provides the context, and paragraph 8 says to proceed according to paragraph 6. Paragraph 8 is clear and straightforward: if Cabela's opens another store in the 12-county region within 5 years, then Hawks Prairie gets its $5 million back, and at its election, either the value of the land it conveyed to Cabela's for $10, or it may buy back the land for the value only of the improvements.

5.     The refund of Hawks Prairie's $5 million payment to Cabela's is enforceable as liquidated damages.  Washington courts regularly enforce such damages provisions, particularly where they are "fairly and understandingly entered into by experienced, equal parties with a view to just compensation for the anticipated loss."  Walter Implement, Inc. v. Focht, 730 P.2d 1340, 1343 (Wash. 1987).  Cabela's is an "experienced businessman," see Wallace Real Estate Inv., Inc. v. Groves, 881 P.2d 1010, 1019 (Wash. 1994), and it explicitly included the $5 million repayment as damages for breach of two obligations in the contract, including the 12-county restriction.  Cf. Watson v. Ingram, 851 P.2d 761, 765 (Wash. Ct. App. 1993) ("[T]he fact that Watson never objected to the terms of the agreement indicates that he did not find [the liquidated-damages provision] to be an unreasonable estimate of Ingram's potential loss if a breach occurred.").  Moreover, the impact of Cabela's breach of the 12-county restriction was inherently hard to ascertain.  See Mgmt., Inc. v. Schassberger, 235 P.2d 293, 297 (Wash. 1951) (noting there was "no question" that the harm caused by breaching a contract not to compete was very difficult to ascertain).  Had the market thirsted for more development, the only Cabela's in the region would have been a bigger draw than one of two or more, but the economic value of the draw would be very difficult to determine.

8

**AFFIRMED**.