[No. 29887-9-I.   Division One.   May 24, 1993.]

WAYNE WATSON, *Appellant,* v. JAMES INGRAM, *Respondent.*

*William G. Knudsen,* for appellant.

*Ernest A. Bentley* and *Bentley, Uhrig & Gallery,* for respondent.

AGID, J. — Wayne Watson appeals the findings of fact, conclusions of law, and judgment of $15,000 entered against him in favor of James Ingram. Watson argues that the trial court erred by concluding that the liquidated damages clause in the parties' purchase and sale agreement was valid and enforceable and that Ingram breached an implied duty of good faith by refusing to extend the scheduled closing date of the sale. We affirm.

On August 6, 1990, Wayne Watson and James Ingram entered into a purchase and sale agreement in which Watson agreed to buy Ingram's Bellingham house for $355,000 payable in cash on December 3, 1990.[1] Watson also agreed to

---

[1] Because Wayne Watson was living in California in August 1990, his father, Richard Watson, represented him during the negotiations with Ingram.

pay $15,000 into escrow as nonrefundable earnest money to be applied to the purchase price.

Although Watson's original offer stipulated that the agreement would be contingent upon the sale of his Blaine, Washington, condominium, Ingram would not agree to that contingency because he wanted to sell the house as soon as possible. Ingram made a counteroffer that had no contingencies except his promise to finish remodeling an office in the house, install a sprinkler system in the front yard, and paint the fence. Watson accepted that counteroffer. Two of the contract provisions read as follows:

> 2. BUYER'S REPRESENTATION: Buyer represents that Buyer has sufficient funds available to close this sale in accordance with this Agreement, and is not relying on any contingent source of funds unless otherwise set forth in this Agreement.
>
> . . . .
>
> 24. TERMINATION: In the event of termination of this Agreement, any costs authorized under this Agreement to be advanced from the earnest money deposit shall be deducted before the remaining earnest money is refunded to Buyer or forfeited to Seller. *In the event of default by Buyer, earnest money shall be forfeited to Seller as liquidated damages, unless Seller elects to seek actual damages or specific performance.*

(Italics ours.)

Shortly after Watson and Ingram signed the agreement, Skip Pixley, Ingram's real estate agent, asked Watson if he could list Watson's condominium, which had an underlying mortgage of $74,000. Watson agreed, and Pixley listed it for $187,500. However, the condominium did not sell by the closing date.

On September 11, 1990, Watson applied to Washington Mutual Savings Bank to assume Ingram's $210,000 outstanding mortgage on the house. On October 18, 1990, the bank approved Watson's application conditioned upon Watson's obtaining approximately $116,000 of his own money for closing. Watson, disappointed with those terms, decided not to pursue his plan to assume Ingram's mortgage.

On November 10, 1990, Watson sent a written proposal to Ingram asking him to modify the original agreement. The proposed modification would allow Watson to defer paying

$54,000 of the $355,000 sale price for between 6 and 12 months after the scheduled December closing date. In exchange, Ingram would receive a second lien position on certain real estate Watson owned. Watson also indicated in his proposal that he had been attempting to assume Ingram's mortgage on the Bellingham property.

According to Ingram, the November 10 proposal was the first time he realized that Watson did not have the $355,000 readily available for the purchase of the house, and he became very concerned about whether the sale would close. Consequently, he notified Watson on November 12, 1990, that he would not agree to modify the original agreement and intended to strictly enforce its terms. On or about November 10, 1990, Ingram also accepted from Jamie and Sandro Catracchia a $380,000 "backup" offer for the purchase of the house.

On November 14, 1990, Watson contacted Brent Hamner, a mortgage broker at Security First Mortgage, to apply for a new loan to finance the purchase of the house. Hamner eventually obtained a commitment from an "unnamed source" to loan Watson $266,250. On December 3, 1990, the scheduled closing date, Hamner notified Pixley and Ingram of the loan commitment and, at Watson's request, asked for an extension of time to finalize the financing arrangements. However, according to the undisputed portion of finding of fact 7,

Hamner refused to tell Mr. Pixley or James Ingram the name of the person or institution that had allegedly committed for the $266,250.00 loan. The written document did set forth several contingencies that [had to] be met by Wayne Watson before the loan would actually be made. One of those contingencies was that Wayne Watson would "evidence receipt of funds from income reserve balance of $88,864.56." No written or oral evidence of the availability of this additional $88,864.56 was shown to Skip Pixley or to James Ingram on December 3, 1990.

Further, Hamner could not specify exactly when the loan process would be completed. Consequently, Ingram refused to grant Watson an extension.

On December 4, 1990, Ingram wrote to Kelstrup Realty, where Pixley worked, indicating that he was entitled to the

$15,000 earnest money in escrow because Watson had defaulted. Ingram also asked Kelstrup Realty to "completely terminate the Wayne Watson offer to purchase and proceed to concentrate" on the Catracchias' backup offer. The sale to the Catracchias never closed. However, Ingram finally sold the house in September 1991 for $355,000, the same price that Watson had agreed to pay in December 1990.

Watson sued Ingram in January 1991 to recover the earnest money still in escrow with Kelstrup Realty, alleging that it amounted to a penalty and that Ingram had suffered no actual damages. Watson also alleged that, by refusing to extend the closing date, Ingram acted in bad faith and "thwarted the parties' contractual purpose".

The trial court found that the earnest money "was clearly intended by both parties to be non-refundable" if Watson defaulted and that $15,000 was "a reasonable forecast by [Ingram and Watson] of damages that would be incurred by [Ingram] if [Watson] failed to complete the purchase." It also noted that $15,000 was less than 5 percent of the total sale price. Consequently, the court denied Watson's claim for a refund of the earnest money plus interest and entered a judgment granting Ingram $15,000 as liquidated damages. The court also awarded Ingram his attorney fees pursuant to the parties' agreement.[2] Watson now appeals that judgment.

We first consider whether the parties' contract provision requiring Watson to forfeit the $15,000 nonrefundable earnest money is a valid provision for liquidated damages. Watson argues that the provision is a penalty for his failure to perform the contract and, thus, is unenforceable.

■■ Generally, Washington courts favor liquidated damages clauses and uphold them if the sums involved do not amount to a penalty. *Management, Inc. v. Schassberger*, 39

---

[2]The agreement includes a provision that "[i]n the event that Buyer, Seller or Broker shall commence proceedings or institute action to enforce any rights hereunder, the prevailing party shall be entitled to costs and reasonable attorney's fees, including those for appeals."

Wn.2d 321, 326-27, 235 P.2d 293 (1951); *Lind Bldg. Corp. v. Pacific Bellevue Devs.*, 55 Wn. App. 70, 73, 776 P.2d 977, *review denied*, 113 Wn.2d 1021 (1989). In contrast to liquidated damages,

> a penalty is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of nonperformance, and it involves the idea of punishment. It is the payment of a stipulated sum on breach of contract, irrespective of the damage sustained. Its essence is a payment of money stipulated as in terrorem of the offending party, while the essence of liquidated damages is a genuine covenanted pre-estimate of damages."

*Management, Inc.*, 39 Wn.2d at 326 (quoting 15 Am. Jur. *Damages* § 241, at 672 (1938)).

In *Management, Inc.*, our Supreme Court adopted the following rule to determine whether a liquidated damages clause in a noncompetition agreement is enforceable:

> "(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless
>
> "(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and
>
> "(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."

39 Wn.2d at 327-28 (quoting Restatement of Contracts § 339, at 552 (1932)). In that case, the sellers of a laundromat signed a covenant not to compete with the buyers, Management, Inc. A liquidated damages clause in the contract required the sellers to pay the buyers $10,000 if they breached the covenant. When one seller acquired an interest in a local laundromat, Management, Inc., sued to recover the $10,000 in liquidated damages. The trial court held that the seller had in fact breached the covenant but concluded that the liquidated damages clause was a penalty and refused to enforce it. 39 Wn.2d at 325.

In affirming the trial court, the Supreme Court focused its analysis entirely on the issue of whether $10,000 was a "reasonable forecast of just compensation for the harm that is caused by the breach". 39 Wn.2d at 328-31. As to the other

prong of the analysis, the court held that there was no question that "in this type of case [breach of a covenant not to compete], the harm caused by the breach usually is incapable of accurate estimation." 39 Wn.2d at 328.

In *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 559, 730 P.2d 1340 (1987), the court relied upon *Management, Inc.*, to conclude that a liquidated damages clause in an agreement to lease farm equipment was unenforceable. The clause required the breaching lessee to pay 20 percent of the outstanding rental payments at the time of the breach. 107 Wn.2d at 560. Because the amount of liquidated damages was not reasonably related to the anticipated harm that would result from a breach and because such damages were not difficult to ascertain, the court concluded that the provision was a penalty. 107 Wn.2d at 561.

Neither *Management, Inc.*, nor *Walter Implement* involved an agreement to purchase land. However, in *Lind* this court applied *Walter Implement* in the context of a real estate purchase and sale agreement. It relied upon the Restatement (Second) of Contracts § 356 (1981)[3] to clarify the rule applied in *Walter Implement*. *Lind*, 55 Wn. App. at 74. It held that, for a liquidated damages clause to be enforceable, (1) the parties to the agreement must estimate the just compensation for damages anticipated from a breach; (2) the party who would collect the liquidated damages must have suffered some actual loss because liquidated damages are meant to be compensation for loss and not punishment for failure to perform;[4] and (3) the alleged losses must be difficult to prove. 55

---

[3]The Restatement (Second) of Contracts § 356 (1981) provides: "(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *See Lind*, 55 Wn. App. at 74.

[4]As the court explained, if "substantial sums" are recovered as liquidated damages when no actual damage or loss results from a breach, those sums are no longer compensatory damages but serve instead as a penalty. *See Lind*, 55 Wn. App. at 75.

Wn. App. at 78-81. *Lind* involved a buyer who breached an agreement to purchase commercial real estate for more than $4 million. The contract's liquidated damages clause required the buyer to make an initial $20,000 deposit on the purchase price. The buyer made additional deposits totaling $230,000 over time for various reasons. When the buyer ultimately breached the agreement, the seller sought to recover the entire $250,000 as liquidated damages. The trial court granted the seller the relief it sought, ruling that the liquidated damages clause was enforceable as to all of the payments. *Lind*, 55 Wn. App. at 72.

On appeal, the court reversed concluding that the clause was a penalty for several reasons. First, the $250,000 "had no apparent relationship to liquidated damages," and no evidence indicated that anything more than the initial $20,000 deposit had been determined by the parties to be a reasonable estimation of anticipated damages. *Lind*, 55 Wn. App. at 78. Second, after the buyer breached, the seller sold the commercial property for approximately $1 million more than the original buyer was obligated to pay. Therefore, the seller's actual damages, if any, were minimal and bore no relation to the claimed liquidated damages. 55 Wn. App. at 80-81. Finally, the damages ("finance charges for holding the property in an undeveloped condition", office overhead, and real estate taxes) were "readily ascertainable and provable". *Lind*, 55 Wn. App. at 81.

■ ■ In the present case, the parties' agreement unequivocally states that Watson's $15,000 nonrefundable earnest money deposit would serve as liquidated damages if Watson defaulted under the agreement. There are no additional payments at issue as there were in *Lind*. Although the parties did not expressly determine what Ingram's anticipated loss might be if Watson defaulted, the fact that Watson never objected to the terms of the agreement indicates that he did not find $15,000 to be an unreasonable estimate of Ingram's potential loss if a breach occurred. Neither *Lind* nor *Walter Implement* requires the parties to specifically discuss anticipated losses from a breach. *See Walter Implement,*

107 Wn.2d at 559-60; *Lind*, 55 Wn. App. at 78. It is suffi-
cient that the amount specified as liquidated damages at the
time of contracting is a "reasonable forecast" of the compen-
sation necessary to make the seller whole should the buyer
breach (*Management, Inc.*, 39 Wn.2d at 328; *Northwest
Acceptance Corp. v. Hesco Constr., Inc.*, 26 Wn. App. 823,
828-29, 614 P.2d 1302 (1980)), and that it is not "patently in
excess of the actual damage which could be suffered", *i.e.*,
unreasonable. *Lind*, 55 Wn. App. at 77 (quoting *American
Fin. Leasing & Servs. Co. v. Miller*, 41 Ohio App. 2d 69, 75,
322 N.E.2d 149 (1974)). Here, the $15,000 earnest money
was less than 5 percent of the purchase price. Such a small
percentage of the entire purchase price is not an unreason-
able amount to require as liquidated damages[5] and, conse-
quently, the parties' agreement satisfies the first of *Lind*'s
three requirements for an enforceable liquidated damages
clause.

In analyzing the other two requirements, we must con-
sider the functions that liquidated damages clauses gener-
ally serve in real estate agreements. The nonrefundable ear-
nest money deposit does have a coercive purpose, in part,
and for that reason may appear to be similar to a penalty.
The greater the amount of the deposit, the more coercive the
effect. However, we do not believe that the potentially coer-
cive aspect of earnest money agreements should always pre-
vent the enforcement of those agreements. No overriding

---

[5]We note that in 1991, after *Lind* was published, the Legislature passed
Substitute House Bill 2042, which reads in pertinent part:

A provision in a written agreement for the purchase and sale of real estate
which provides for the forfeiture of an earnest money deposit to the seller as
the seller's sole and exclusive remedy if the purchaser fails, without legal
excuse, to complete the purchase, is valid and enforceable, regardless of
whether the seller incurs any actual damages, PROVIDED That:

(i) The total earnest money deposit to be forfeited does not exceed five
percent of the purchase price[.]

RCW 64.04.005(1)(a). The note following the statute states that the provisions of
the act "apply only to written agreements entered on or after July 28, 1991.'"
Therefore, it does not apply to the agreement at issue here but does set forth the
legislative determination that 5 percent of the purchase price is a reasonable
amount of liquidated damages in a real estate transaction.

public policy considerations require such a sweeping conclusion, especially in light of the valuable and necessary function that earnest money agreements have of anticipating the possible damages that may result if the buyer breaches the purchase agreement. The amount of the deposit represents the parties' agreement about what will serve as sufficient liquidated damages for a breach. So long as the deposit amount agreed upon is not so disproportionate to possible damages as to be unconscionable, when estimated prospectively from the time the contract is formed, the terms of the earnest money agreement should be enforced without regard to the retrospective calculation of actual damages or the ease with which they may be proved. To the extent these views conflict with this court's opinion in *Lind*, we decline to follow that opinion.[6]

As the present case demonstrates, the amount of damages that may result from a breach is not easily calculated when parties execute a purchase agreement. When the present contract was formed, Ingram knew that he would make certain improvements at his own expense. If Watson breached, Ingram could not reasonably know if or to what extent the property value would be enhanced by the improvements. Nor could he know what appreciation or depreciation in the local real estate market would occur before another sale could be effected. Though Ingram would have known when he signed the agreement that the value of the use of the net sale proceeds would be lost in the event of a breach, he could not have known for how long. Thus, both parties accepted some risk that the benefit of their bargain might be adversely affected during the period pending a projected closing date.

Given those uncertainties and the sale price in this case, the $15,000 earnest money deposit does not shock the court's conscience. Further, even if we were to apply *Lind* and undertake a retrospective analysis of the actual damages sustained,

---

[6]*See* Note, *"Keep the Change!": A Critique of the No Actual Injury Defense to Liquidated Damages*, 65 Wash. L. Rev. 977 (1990). These views do, however, harmonize with the Legislature's subsequent enactment of Substitute House Bill 2042.

Ingram presented evidence at trial of more than $15,000 in damages he suffered as a result of Watson's breach. The record indicates that Ingram had completed the agreed-upon improvements to the property (finishing the office, installing the sprinkler system, and painting the fence) at a cost of $8,229 and paid taxes of between $232 and $292 per month from December 1990 through September 1991. He also paid $1,700 in interest on his mortgage each month and $200 in monthly utility bills. Most persuasive is the evidence that Ingram finally sold the house to someone 10 months after Watson's breach for exactly the same price that Watson had agreed to pay, despite Ingram's additional costs for maintenance and improvements. Although the trial court did not enter a finding as to those damages,[7] the record clearly supports the conclusion that Ingram suffered actual damages in an amount at or near $15,000 as a result of Watson's breach.

We recognize that Ingram has not and, indeed, cannot demonstrate that his damages were impossible or very difficult to prove *at the time of trial* as *Lind* requires. Given the costs itemized above, Ingram clearly had little difficulty proving his damages even though it would have been quite difficult to estimate them when he and Watson initially executed the agreement. To the extent *Lind* requires damages from a breach of a real estate agreement to be difficult to prove at trial before an otherwise valid liquidated damages clause may be enforced, we do not think that conclusion is supportable in the context of an earnest money agreement such as the one at issue here.[8] *Lind* based its holding upon

---

[7]The trial court had before it a proposed finding that Ingram had spent more than $8,000 by making the improvements and paid $1,700 per month in interest. However, the trial court deleted that portion of the finding at the request of Watson's counsel because, as the trial court reasoned, "if for some reason or another it's remanded to the Court to find actual damages, then we can get into it at that time. That way we won't be bound by some previous finding we made, because there really wasn't much evidence of that."

[8]We note that the *Lind* court may not have contemplated a case such as this in which the "reasonable forecast" requirement for a valid liquidated damages claim is so readily met. *Lind* focuses almost entirely on the excessive amount of

section 356 of the Restatement (Second) of Contracts (1981) and *Walter Implement*. 55 Wn. App. at 74, 77. Section 356 does not, however, require damages to be impossible or very difficult to prove. Instead, it states that damages may be liquidated in an agreement but "only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." *Lind*, 55 Wn. App. at 74.

Further, *Walter Implement* relied upon *Management, Inc.*, which involved not a breached lease agreement but a breached covenant not to compete where damages are "usually... incapable of accurate estimation." *Management, Inc.*, 39 Wn.2d at 328. In contrast, much of the damage flowing from a breached real estate agreement is much more readily demonstrated once a breach occurs. In our view, to impose on real estate agreements the requirement that damages must be very difficult to prove at trial would entirely defeat the purpose of earnest money deposits in those agreements. Rarely, if ever, will a seller have difficulty identifying the costs of maintaining the property for the period between the buyer's breach and the time the property finally is sold. The seller's damages typically include those maintenance costs plus the diminution in price, if any, that the ultimate buyer paid for the property.[9]

In addition, in the context of real estate agreements, a requirement that damages be difficult to prove at trial would encourage litigation in virtually every case in which the sale did not close, regardless of whether the earnest money

---

the liquidated damages in that case in view of the subsequent sale of the property for $1 million more than Lind had agreed to pay. 55 Wn. App. at 73-81. The court devoted only a brief paragraph to the difficulty of proving actual damages, 55 Wn. App. at 81, which clearly was not the primary issue before it.

[9]We recognize that one component of damages in such a case may be lost opportunities for a sale at a higher price while the property was kept off the market by the pending sale agreement. This component of damage from a breach of a real estate agreement may well be difficult or impossible to ascertain even after the breach. However, this issue was not presented in *Lind* or argued in the court below. We therefore do not rely on it as a basis for upholding the liquidated damages award here.

deposit was a reasonable estimate of the seller's damages. This result is directly contrary to the policy reasons for favoring liquidated damages provisions in agreements between parties with equal bargaining power: certainty, assurance that the contract will be performed, and avoidance of litigation. *Management, Inc.*, 39 Wn.2d at 326-27. We hold, therefore, that a liquidated damages clause in a real estate agreement is enforceable against a buyer who has breached the agreement if the record shows that the amount specified in the agreement was, when the contract was executed, a reasonable estimate of just compensation for the anticipated breach.[10]

On the facts in this case, the record is clear that the earnest money deposit of $15,000 was a reasonable estimate of just compensation for the damages Ingram sustained from Watson's breach, particularly in light of the fact that the deposit was less than 5 percent of the purchase price. Thus, the trial court properly enforced the parties' liquidated damages agreement.

The second issue presented is whether an implied covenant of good faith and fair dealing obligated Ingram to grant Watson an extension of time to complete the financing process for the purchase of the house.

In *Cavell v. Hughes*, 29 Wn. App. 536, 539, 629 P.2d 927 (1981), the court stated that "[i]n every contract there is an implied covenant of good faith and fair dealing which obligates the parties to cooperate with one another so that each may obtain the full benefit of performance." *See also White & Bollard, Inc. v. Goodenow*, 58 Wn.2d 180, 361 P.2d 571 (1961). However, nothing in either *Cavell* or *White & Bollard* requires a seller to alter the express terms of an agreement which specified the closing date of a real estate transaction.

Despite the assurances that Watson and Hamner gave Ingram that the financing process would be completed within

---

[10]This is the same rule that applies to all such agreements entered into after July 28, 1991, under RCW 64.04.005(1)(a). See footnote 5.

58

a few days of the scheduled closing date, Ingram had several reasons to doubt whether the sale would actually occur. For example, Ingram originally believed that Watson had the money available to purchase the house and was surprised to learn that Watson was trying to finance 95 percent of the purchase price. Further, Hamner's assurances to Ingram on December 3 regarding Watson's loan approval did not identify the lender and had several conditions attached to it. Critical among them was the requirement that Watson show evidence of having an "income reserve balance" of $88,864. Watson provided no such evidence.

Thus, contrary to Watson's assertions, the evidence was not "clear and uncontroverted" that he would have the funds necessary to complete the purchase within days of the December 3 closing date. By refusing to extend the closing date, Ingram was protecting his own interest in what appeared to him to be an unlikely deal. He did not breach any duty of good faith and fair dealing.

Because Ingram is the prevailing party on appeal, he is entitled to his reasonable attorney fees and costs pursuant to the parties' agreement.

The trial court's judgment is affirmed.

FORREST and BAKER, JJ., concur.

Reconsideration denied June 24, 1993.

Review granted at 123 Wn.2d 1001 (1994).