[No. 31254-5-I. Division One. January 31, 1994.]

WALLACE REAL ESTATE INVESTMENT, INC., *Appellant,*
v. JOANNA C. GROVES, ET AL,
*Respondents.*

*Harold Chesnin* and *Mathews, Garlington — Mathews & Chesnin,* for appellant.

*Steven P. Michael,* for respondents.

PEKELIS, J. — Wallace Real Estate Investment, Inc. (Wallace) appeals the dismissal of its claim for the refund of $260,000 in earnest money and extension payments retained as liquidated damages under a real estate purchase and sale agreement. We affirm.

## I

On August 1, 1989, Roddy Cox, Wallace's assignor, and Joanna Groves, James Siler, and Charles Siler (the sellers) executed a real estate purchase and sale agreement and first addendum whereby Cox agreed to pay $1,520,000 for 10 acres of undeveloped property located in Snohomish County, Washington.

The sellers and Cox, the assignor-purchaser, negotiated the purchase price. At the time of contracting, property values were escalating and were in considerable flux. With this in mind, the sellers established the purchase price to encourage a quick cash sale.[1] The agreement and first addendum required a $20,000 earnest money deposit. A standard form liquidated damages provision applied to the deposit:

> DEFAULT AND ATTORNEY FEES
>
> In the event of default by Buyer, Seller shall have the election to retain the earnest money as liquidated damages, or to institute suit to enforce any rights Seller has. In the event that either the Buyer, Seller, or Agent shall institute suit to enforce any rights hereunder, the successful party shall be entitled to court costs and a reasonable attorney's fee. In the event of trial, the amount of the attorney's fee shall be as fixed by the court. . . .

The first addendum provided for 12 monthly extension periods and required a $15,000 payment for each extension. Although the first addendum did not specifically mention liquidated damages, paragraph 7 stated: "The $20,000 deposit and subsequent extention [sic] payments are non-refundable. . . ."

The sellers sought the extension payments as compensation for the delay in closing. Specifically, the $15,000 amount represented the lost investment value of the purchase price, calculated at 12 percent simple interest of the $1,520,000 purchase price.

---

[1] It is undisputed that the sellers needed the funds that the sale would generate. Both Joanna Groves and her husband were unemployed at the time of contracting. In addition, Joanna Groves and James Siler had personal loans, secured by the property, which were accruing interest.

Although Cox was the initial purchaser, he negotiated the agreement with the intention of assigning his interest to Wallace, which he did in September 1989. During the negotiation process, Cox consulted with William Wallace, the president of Wallace Real Estate Investment, Inc., about the sellers' objectives and terms, including the purpose of the extension payments.

In a January 29, 1990, letter to Wallace, Joanna Groves explained the purpose of the $15,000 extension payments: "The payments, as you know, represent the appreciation in value that we estimated was being lost for the period of time we were to hold the property for the purchaser."

After the last $15,000 extension payment, the parties negotiated a second addendum to the purchase and sale agreement. During the negotiations, Wallace and the sellers exchanged at least three versions of the second addendum before Cox and the sellers actually executed the final version on September 19, 1990. The second addendum provided for two $30,000 extension payments for October and November 1990 and established December 17, 1990, as the new closing date. William Wallace countersigned the second addendum.

The nonstandardized liquidated damages provision to the second addendum provided:

> Liquidated damages: The parties hereto agree that in the event Buyer or its assign fails to comply with the terms of this Agreement, as amended and compromised, Seller shall retain all payments made to date (earnest money and extension payments) as liquidated damages and not as penalty, in order to indemnify the Seller against loss as a result of breach of this agreement. *It is agreed that damages that result to Seller include: freezing the purchase price at a time when real estate land values were escalating at unprecedented rates; compensating seller for holding the property off the market and losing the time value of its property were the property liquidated and funds invested; lost opportunity for larger profits; and related costs.* Sellers and Buyer, and its assign, recognize a general measure of the damages to Seller is represented by the earnest money and extension payments. It is further agreed that the damages that may result from a breach of this agreement are uncertain and difficult to ascertain any more than Seller and Buyer have

done, and that the agreed amount is a reasonable estimate of the probable damages to Seller.[2]

(Italics ours.)

On December 13, 1990, William Wallace wrote to the sellers seeking to extend the closing, stating:

I am prepared to close with all the sellers on the same date. This would have been done on December 17, 1990 had not (i) the Phase I sellers unexpectedly demanded a January closing, and (ii) Cox's attempts to prevent my closings unless I pay him more money than he had agreed to . . .. I request a new agreement with everyone to close on or about January 7, 1991.

The sellers refused and, in a December 14, 1990, letter, informed Wallace that they were prepared to close as scheduled on December 17, 1990.

On December 17, 1990, Joanna Groves and Charles Siler attended the closing; however, James Siler could not attend due to a back injury. William Wallace did not attend. Despite Wallace's failure to attend, Joanna Groves express mailed the deed and closing papers to James Siler in order to complete the closing.[3] On December 20, 1990, Siler returned the closing documents to Joanna Groves, who then delivered them to Tyee Escrow on December 21, 1990.

On December 24, 1990, Tyee Escrow received the sellers' notice of cancellation, which they had executed on December 21, 1990. The sellers then retained the $260,000 in earnest money and extension payments as liquidated damages.

Wallace filed suit alleging breach of contract and seeking specific performance. These claims were dismissed upon

---

[2]In addition, during negotiations the sellers expressed the need to increase the amount of the extension payments because of a substantial real estate tax payment coming due on the property.

[3]The original agreement provided:
"Closing—Unavoidable Delay
"In the event that this sale cannot be closed by the date provided herein due to the inability of either party . . . to sign and/or deliver any necessary document, or deposit any necessary money, because of . . . incapacitating illness; . . . the closing date shall be extended seven days beyond cessation of such condition, but in no event more than 14 days beyond the closing date provided herein."

sellers' summary judgment motion. However, the validity of Wallace's claim for the $260,000 of earnest money and extension payments was reserved for trial.

At trial, Dr. Eugene Silberberg, a University of Washington economics professor, testified to the reasonableness of the $15,000 extension payments. He opined that the $15,000 amount per payment based on 12 percent interest was reasonable because, at minimum, a lender would charge 12 percent interest to finance a project similar to that planned by Wallace. In addition, Silberberg stated that Wallace's willingness to pay 13 percent interest on a loan to cover the extension payments further indicated the reasonableness of the $15,000 amount.

Following the bench trial, the trial court made the following unchallenged findings of fact: the purchase price "was a compromise figure largely motivated by consideration of the sellers receiving the purchase price in cash through an early closing." Furthermore, the terms were intended to encourage a "quick sale" and closing and to compensate the sellers for any delay in closing.

As to the $15,000 extension payments, the court found:

> For every thirty days closing was delayed the buyer and sellers agreed a reasonable interest value was fifteen thousand dollars per month, an amount suggested by the buyer, Mr. Cox. Although the contract does not so designate the payment as interest, the buyer, Mr. Cox, and the sellers understood that was the price for the extension of the delay in closing, which was rationally based upon what the buyer and sellers perceived any delay would actually cost the sellers. *Mr. Cox was a credible, forthright witness, who amply supports that finding.*
> . . . The buyer and sellers calculated the cost of the delay in closing based upon 12 percent simple interest on the investment value not realized. The interest component was contemplated to represent the cost to the sellers of holding the property off the market.

(Italics ours.)

The court further found that Mr. Cox, as purchaser, and the sellers "freely negotiated and accepted the extension payment amount as a reasonable amount with a rational basis, as a component of the initial transaction . . .".

The court found that Joanna Groves' January 29, 1990, letter to Wallace "was not inconsistent with the settling with Mr. Cox to have the extension payments represent interest on the unrealized return of the asset."

As to the $30,000 extension payments, the court found:

> With respect to the two $30,000.00 payments made for extensions in October and November 1990, $15,000.00 of each payment constituted a penalty, because nothing had changed from before with respect to the previous interest rationale. The first $15,000 still represented the loss of access to the purchase money. The second $15,000 per month was a reasonable penalty under the circumstances.

With respect to Wallace's performance on December 17, 1990, the final closing date, the court found:

> The plaintiff by letter to the sellers dated December 13, 1990 [exhibit 49], clearly stated he was not going to perform on December 17, 1990. He made no suggestion that he had the money and was ready to perform, or that he would attend closing.
>
> Everything in the defendants' history of their dealing with the plaintiff supported the conclusion that when he said he was not going to be there with the purchase monies of approximately one million five hundred thousand dollars, he was not going to be there to perform.

With respect to the sellers' performance, the court found:

> Mr. James Ronald Siler, who resided in the State of Oregon, was incapacitated on December 17, 1990, confined to bed at his residence suffering a bad back that prevented him from travel to the closing at Tyee Escrow in Everett on December 17, 1990. . . . His incapacity comes within the terms of the purchase and sale agreement permitting a delay in seller's performance. The submission by mail of escrow papers and deed, signed by James Ronald Siler, to Tyee Escrow shortly after December 17, 1990, met the requirements of the purchase and sale agreement, as amended.

The court concluded that the earnest money and all extension payments "[were] a freely negotiated sum, [were] reasonable in light of the loss suffered by the seller, and [were] a compromise amount." The court further concluded that the "earnest money and extension payments do not constitute an unreasonable penalty."

## II
### VALIDITY OF THE LIQUIDATED DAMAGES PROVISIONS

Wallace contends that, under *Lind Bldg. Corp. v. Pacific Bellevue Devs.*, 55 Wn. App. 70, 776 P.2d 977, *review denied*, 113 Wn.2d 1021 (1989), the trial court erred in dismissing his claim for the refund of $260,000 in earnest money and extension payments. He argues that the liquidated damages provisions are unenforceable as penalties.

Wallace failed to assign error to any of the trial court's findings of fact. Unchallenged findings become verities on appeal. *In re Marriage of Ambrose*, 67 Wn. App. 103, 105, 834 P.2d 101 (1992). When the facts are undisputed, and the only issues are questions of law, review is de novo. *DuVon v. Rockwell Int'l*, 116 Wn.2d 749, 753, 807 P.2d 876 (1991).

It is well established that liquidated damages clauses are favored in Washington and that they are upheld where the sums involved do not constitute a penalty. *Watson v. Ingram*, 70 Wn. App. 45, 49-50, 851 P.2d 761 (1993) (citing *Management, Inc. v. Schassberger*, 39 Wn.2d 321, 326-27, 235 P.2d 293 (1951); *Lind Bldg. Corp. v. Pacific Bellevue Devs.*, 55 Wn. App. 70, 73, 776 P.2d 977, *review denied*, 113 Wn.2d 1021 (1989)), *review granted*, 123 Wn.2d 1001 (1994). On the other hand, it is frequently said that:

> a penalty is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of nonperformance, and it involves the idea of punishment. It is the payment of a stipulated sum on breach of contract, irrespective of the damage sustained. Its essence is a payment of money stipulated as in terrorem of the offending party, while the essence of liquidated damages is a genuine covenanted pre-estimate of damages.

*Management, Inc.*, 39 Wn.2d at 326 (quoting 15 Am. Jur. *Damages* § 241, at 672 (1938)).

Wallace relies on the 3-part rule enunciated in *Lind*, 55 Wn. App. at 78-81, which provides that a liquidated damages clause in a real estate purchase and sale agreement is valid if: (1) the parties to the agreement make an estimate of

the just compensation for the damages anticipated from a breach; (2) the party who would collect the liquidated damages suffers some actual loss; and (3) the alleged losses are difficult to prove at trial.

However, since the briefs were submitted, this court has revised the approach to liquidated damages previously taken in *Lind*. In *Watson v. Ingram, supra,* we questioned the applicability of the last two *Lind* elements to real estate agreements. *Watson,* 70 Wn. App. at 53-57. In so doing, we reduced the test for determining the validity of a liquidated damages provision to the sole inquiry of whether "the record shows that the amount specified in the agreement was, when the contract was executed, a reasonable estimate of just compensation for the anticipated breach." *Watson,* at 57.

Wallace contends that because the agreement in *Watson* was for the purchase of residential property, the *Watson* rule does not apply to commercial real estate agreements, such as the one here, and that the *Lind* rule should be applied instead.

We disagree. The reasons for eliminating the requirement of actual damages and the requirement that losses be difficult to prove at trial are equally relevant to commercial real estate agreements as they are to residential real estate agreements. For instance, in reexamining the *Lind* test, we acknowledged that the coercive nature of liquidated damages clauses in real estate agreements may resemble a penalty, but we further recognized that this should not "always prevent the enforcement of those agreements." *Watson,* at 53. Instead, we focused on the "valuable and necessary function that earnest money agreements have of anticipating the possible damages that may result if the buyer breaches the purchase agreement." *Watson,* at 54. In commercial real estate agreements this function becomes even more important because, typically, the parties will be more experienced in anticipating the possible damages that may result from a breach at the time of contracting.

Furthermore, in the context of commercial real estate agreements, no reason exists for requiring losses to be dif-

ficult to prove at trial. As we explained in *Watson*, this requirement defeats the purpose of liquidated damages provisions in real estate agreements because, typically, sellers will be able to prove the losses caused by the breach by the time of trial. *Watson*, at 56. We also noted that this requirement defeats the purposes behind liquidated damages provisions of avoiding litigation, promoting certainty, and assuring contract performance because buyers will be more likely to litigate the validity of the liquidated damages provisions. *Watson*, at 56-57.

Thus, we agree with the *Watson* test and analyze Wallace's contentions under the single test approach of whether, at the time of contracting, the record shows that the amounts withheld as liquidated damages were a reasonable forecast of just compensation for the anticipated breach.[4]

In arguing that the twelve $15,000 extension payments were not a reasonable forecast of anticipated damages, Wallace focuses on an alleged discrepancy in the sellers' explanation of the purpose of the extension payments. Specifically, Wallace argues that Groves' January 29, 1990, letter, which stated that the extension payments were to capture the appreciation value lost when the property was off the market, proves that the parties did not contemplate the $15,000 extension payments to compensate the sellers for

---

[4]We are confident that even if the *Lind* test were applied, the trial court's determination that the liquidated damages provisions are valid would be upheld. Although the trial court made no finding as to actual loss, the $15,000 per extension payment was derived from the lost investment value on the principal. In addition, at trial, there was substantial evidence that the property had depreciated in value by December 17, 1990, the date of the breach. Furthermore, the record indicates that the property was appreciating in value when the contract was executed and that the purchase price had been reduced to achieve a quick cash sale. As a result, the sellers may have forgone an opportunity to sell the property for the same, if not a higher price, during the time the property was held off the market. Finally, the sellers claimed additional losses from interest paid on loans secured by the property and from lost interest in the amount of $147,534 calculated from February 6, 1991, to January 31, 1992, during which time Wallace had a lis pendens recorded against the property.

As to the difficulty of proving damages at trial, the vigorous dispute between the parties as to the amount of actual damages is ample evidence that this requirement is met.

the lost investment value on the principal during the closing delay.[5]

However, any discrepancy is meaningless because Wallace failed to assign error to the trial court's findings; thus, they are verities on appeal. As to the purpose of the $15,000 extension payments, the trial court found that when the first addendum was executed the parties understood the $15,000 extension payments represented the sellers' cost from the closing delay, calculated at 12 percent simple interest on the unrealized investment value.

 Thus, we need only address whether, at the time of contracting, the amounts withheld as liquidated damages were a reasonable forecast of just compensation for the anticipated breach. Based on our review of the record, substantial evidence exists to support the trial court's conclusion that the $15,000 monthly extension payments were a reasonable forecast of just compensation for the damages sustained from Wallace's breach.[6]

Next, Wallace challenges the validity of the $30,000 extension payments under the second addendum. Wallace argues that when the second addendum was negotiated the parties never made a reasonable forecast of the damages in the event of breach and that no reason supports the additional $15,000 amount per extension payment. Thus, Wallace contends that the $30,000 extension payments are void as a penalty.

We disagree. The second addendum is even stronger than the first addendum because it does not require after-the-fact analysis. The second addendum explicitly states in the liqui-

---

[5]Wallace also focuses on the fact that the first addendum does not explicitly contain the interest rationale. However, because *Watson* does not require the parties to specifically discuss the anticipated losses from a breach, *Watson*, at 52-53, it is not significant that the first addendum did not denominate the $15,000 extension payments as lost investment value.

[6]Both the fact that Wallace, who was apprised throughout the contract negotiations, countersigned the agreement and the fact that Wallace financed the extension payments with a loan accruing 13 percent interest supports the finding that the $15,000 extension payments were a reasonable forecast of the sellers' damages.

dated damages provision that the $30,000 extension payments were intended to compensate the sellers for "freezing the purchase price at a time when real estate land values were escalating at unprecedented rates; compensating seller for holding the property off the market and losing the time value of its property were the property liquidated and funds invested; lost opportunity for larger profits; and related costs". Because this language in itself is the best evidence of the parties' attempt to reasonably forecast the sellers' damages, we need not look to the parties' later testimony regarding their purpose.

Furthermore, the trial court's findings support the conclusion that the $30,000 was a reasonable forecast of the seller's damages in continuing to hold the property off the market. In finding of fact 14 the court stated:

> With respect to the $30,000.00 payments . . ., $15,000.00 of each payment constituted a penalty, because nothing had changed from before with respect to the previous interest rationale. The first $15,000 per month still represented the loss of access to the purchase money. The second $15,000.00 per month was a reasonable penalty *under the circumstances.*

(Italics ours.)

In order to put the "circumstances" in context, we first look to finding of fact 13, in which the court found that Wallace had not made any payments other than extension payments and that "there was no real indication that the sellers were going to see their 1.5 million in the immediate future."

We next look to the trial court's oral decision, which may also be used to interpret and explain the findings and judgment when it is consistent with them. *See Ferree v. Doric Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963). In its oral decision, the court stated the extension payments were "a penalty for not getting with it and not fulfilling the spirit of the agreement to have a quick, prompt cash sale considerably earlier in the proceedings" and that there was a "substantial change in the liquidity of [the] property".

Given that the parties expressly detailed the sellers' anticipated losses as $30,000 in the negotiated liquidated dam-

ages provision and based on our review of the record, the trial court did not err in concluding that the liquidated damages provision was enforceable.

## III
### EVIDENTIARY ASSIGNMENTS OF ERROR

Wallace first assigns error to the trial court's admission of Dr. Silberberg's expert testimony regarding the reasonableness of the $15,000 extension payments. It appears Wallace objected on the grounds of relevancy. Wallace contends that the lost interest value on the principal is not a compensable damage because the sellers retained the property as compensation. Thus, Wallace argues evidence regarding lost interest is irrelevant.

Evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more or less probable. *Crescent Harbor Water Co. v. Lyseng*, 51 Wn. App. 337, 344, 753 P.2d 555 (1988); *see* ER 401; ER 402. In the absence of a manifest abuse of discretion, a trial court's ruling regarding relevance will not be reversed. *Crescent Harbor Water Co.*, 51 Wn. App. at 344.

In this case, the trial court properly admitted the testimony of Dr. Silberberg for the purpose of showing the parties' reasonable forecast of the damages anticipated from the buyer's breach at the time of contracting as required under both *Watson* and *Lind*.

However, even if the testimony should have been excluded, error without prejudice is not grounds for reversal. *Brown v. Spokane Cy. Fire Protec. Dist. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983). Error is not "prejudicial unless it affects, or presumptively affects, the outcome of the trial." *Brown*, at 196. The testimony of both Cox and Groves provided an ample basis for the trial court to conclude that the $15,000 extension payments were negotiated by them and represented a reasonable forecast of the sellers' damages.

Wallace next assigns error to the trial court's refusal to admit a December 1991 offer made by a third party on adjacent property. We need not consider this issue because

Wallace does not cite any legal authority or argue any recognizable legal theory in support thereof. *View Ridge Park Assocs. v. Mountlake Terrace*, 67 Wn. App. 588, 602, 839 P.2d 343 (1992), *review denied*, 121 Wn.2d 1016 (1993).[7]

## IV
### THE PARTIES' PERFORMANCE AT CLOSING

Wallace next assigns error to the trial court's conclusion that the sellers failed to concurrently perform under the purchase and sale agreement.

First, Wallace argues that his December 13, 1990, letter did not constitute an anticipatory breach, but merely stated his desire to simultaneously close on all of his purchases and was a request for another closing extension.[8]

■ A party's performance is excused when the other party repudiates the contract. Repudiation is a question of fact. "An intent to repudiate may be expressly asserted or circumstantially manifested by conduct". *CKP, Inc. v. GRS Constr. Co.*, 63 Wn. App. 601, 620, 821 P.2d 63 (1991) (quoting *Hemisphere Loggers & Contractors, Inc. v. Everett Plywood Corp.*, 7 Wn. App. 232, 234, 499 P.2d 85, *review denied*, 81 Wn.2d

---

[7]Moreover, the argument is meritless. Because it is clear that the December 1991 offer could not establish the value of the property at issue on December 17, 1990, it was irrelevant. Wallace himself specifically argued that the subject property should be valued as of December 17, 1990, the date of closing.

Wallace's additional contention that the trial court erred in refusing to admit his June 3, 1992, offer to purchase the property for $1,570,000 is also without merit. Like the December 1991 offer on the adjacent property, this testimony was inconsistent with Wallace's insistence that the time of *closing* be deemed the relevant time period for valuation. As for Wallace's reliance on RCW 5.45.020 as a basis for its admissibility, this was not argued below; therefore, it may not be raised on appeal. *See State v. Negrin*, 37 Wn. App. 516, 526, 681 P.2d 1287, *review denied*, 102 Wn.2d 1002 (1984).

[8]Although Wallace failed to assign error to any of the trial court's findings of fact, in this instance, it is clear from his brief that he is in fact challenging the trial court's finding as to the issue of anticipatory breach. Thus, we will review his contention. *See In re Marriage of Brady*, 50 Wn. App. 728, 730, 750 P.2d 654 (1988).

1007 (1972)), *review denied*, 120 Wn.2d 1010 (1992). In *CKP, Inc.*, the court stated:

> An anticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time for performance. The law requires a positive statement or action indicating distinctly and unequivocally that the repudiating party will not substantially perform his contractual obligations.

63 Wn. App. at 620.

Wallace's December 13, 1990, letter explaining that he could not close on the agreed-to date constitutes substantial evidence supporting the trial court's finding of anticipatory repudiation. Thus, the trial court did not err in finding that Wallace had anticipatorily repudiated on December 13, 1990.[9]

In light of our conclusion that Wallace anticipatorily breached, we need not address Wallace's contention that the sellers did not perform as required on December 17, 1990. Wallace's anticipatory breach relieved the sellers of any duty to perform and to do so would have been a useless act.

As prevailing parties, the sellers are entitled to their attorney's fees pursuant to the attorney's fees provision of the original purchase and sale agreement.

Affirmed.

WEBSTER, C.J., and KENNEDY, J., concur.

Review granted at 124 Wn.2d 1025 (1994).

---

[9]Wallace's additional contention that, even if he did anticipatorily breach, his December 17, 1990, letter constituted a withdrawal of that repudiation hardly merits discussion. The trial court made no findings on this issue. The absence of a finding of fact in favor of the party with the burden of proof about a disputed issue is the equivalent of a finding against that party on that issue. *In re Marriage of Olivares*, 69 Wn. App. 324, 334, 848 P.2d 1281, *review denied*, 122 Wn.2d 1009 (1993).