[No. 31492-1-I.   Division One.   May 9, 1994.]

BLAIR WARD, ET AL, *Respondents*, v. COLDWELL BANKER/SAN JUAN PROPERTIES, INC., *Appellant*.

*Stephen Quesenberry* and *Law Offices of John O. Linde,* for appellant.

*Karen E. Vedder, Eugene H. Knapp, Jr.,* and *Lane Powell Spears Lubersky,* for respondents. [As amended by order of the Court of Appeals June 7, 1994.]

SCHOLFIELD, J. — Coldwell Banker/San Juan Properties, Inc. (Coldwell) appeals from a summary judgment in favor of Blair and Beth Ward (Wards). The trial court ruled that Coldwell breached a fiduciary duty it owed to the Wards by failing to disclose information about the buyers of the Wards' home and by guaranteeing the buyers' bank loan without disclosure to the Wards or their consent. The court found Coldwell liable for the return of the real estate sale commission and the unpaid balance on the buyers' promissory note.[1] We reverse.

## FACTS

In April 1990, the Wards listed their San Juan Island home for sale with Coldwell. Penny Johnston, an officer of Coldwell, and her husband Patrick offered to buy the house. The Wards were aware that Johnston worked for Coldwell. The purchase and sale agreement that the parties executed on April 23, 1990, stated that "purchaser Penny L. Johnston

---

[1]Attorney Timothy Kosnoff appeals an award of sanctions against him in the action by the buyers, Patrick and Penny Johnston (Johnstons), against the Wards for fraudulent concealment of the condition of the house in cause 32290-7-I. The two cases were consolidated for argument in this court but will be decided in separate opinions. The award of sanctions against Mr. Kosnoff was reversed in cause 32290-7-I.

is a licensed real estate agent."[2] The offer was conditioned on the Johnstons' obtaining a "conventional purchase loan". If such a loan were not obtained, the sale agreement would terminate, and the earnest money would be returned to the Johnstons. The following day, the Johnstons applied for a loan from San Juan County Bank (Bank). On May 11, 1990, the Bank declined the loan because the Johnstons' debt-to-income ratio was too high until one of their other two loans was retired (by the sale of one of their "spec" houses).[3]

However, the Bank was willing to make the loan when Coldwell agreed to guarantee the Johnstons' obligation to the Bank. Coldwell made a corporate resolution to make the guaranty after determining that it would be "beneficial" to Coldwell. Coldwell did not tell the Wards about the Bank's original decision to decline the Johnstons' loan application and did not inform the Wards or obtain their consent before making the loan guaranty.

In April 1990, the Johnstons discovered dry rot in the house. The extent of the damage they discovered is disputed. The matter was at least temporarily resolved and the sale closed on May 24, 1990. The Wards received a net cash payment in the amount of $113,601.25. The Wards also received a note secured by a second deed of trust on the property for $32,000.

In January 1991, the present litigation commenced with the Johnstons suing the Wards for concealing extensive dry rot in the house. When the Johnstons lost their suit they declared bankruptcy, and the Wards were not able to collect on the promissory note. The litigation continued on the issue of Coldwell's liability to the Wards for its role in the sale of the house to the Johnstons.

The Wards and Coldwell each moved for summary judgment. The trial court granted summary judgment for the

---

[2]The parties dispute what the Wards knew and what Coldwell told them about Coldwell's relationship with the Johnstons.

[3]The record does not indicate any particular credit problems with the Johnstons other than that they had such high debt that the Bank would not extend more credit without a guarantor.

Wards against Coldwell on August 28, 1992, for return of its real estate commission in the amount of $11,200 and $32,000 on the promissory note. On December 21, 1992, the trial court awarded reasonable attorney fees and costs to the Wards in the amount of $33,342.25, based upon attorney fees provisions in paragraph 9 of the listing agreement and paragraph 18 of the real estate purchase and sale agreement (hereinafter P&S).

Coldwell appeals.

## FIDUCIARY DUTY

Because the issues involved in this appeal were decided on summary judgment, we engage in the same inquiry as the trial court. In doing so, we must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. Summary judgment should be granted only where reasonable persons could reach but one conclusion. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). If reasonable minds could draw different conclusions from undisputed facts, or if all of the facts necessary to determine the issues are not present, summary judgment is improper. *Fleming v. Stoddard Wendle Motor Co.*, 70 Wn.2d 465, 467, 423 P.2d 926 (1967); *Byrne v. Cooper*, 11 Wn. App. 549, 523 P.2d 1216, 75 A.L.R.3d 170, *review denied*, 84 Wn.2d 1013 (1974).

We first decide whether Coldwell's fiduciary duty to the Wards ended when the parties signed the P&S.

When the listing agreement was entered into, Coldwell became the agent of the Wards and owed them a fiduciary duty for the purpose of finding a buyer. *See Mersky v. Multiple Listing Bur. of Olympia, Inc.*, 73 Wn.2d 225, 228, 437 P.2d 897 (1968). It is undisputed that Coldwell's actions occurred after the agreement between the Wards and the Johnstons was made. Coldwell cites authorities to the effect that when the buyer and the seller have entered into a purchase and sale agreement, the broker's commission has been earned, and his fiduciary duty to the seller terminates.

Ward argues, however, that where the sale is conditioned on the buyer obtaining financing, the broker has not earned his fee until the sale closes. Failure to obtain financing can terminate the agreement and, thus, the broker will have failed to procure a willing and able buyer. We agree with Ward. In this case, the sale closed, and Coldwell's guaranty of the bank loan came between signing the P&S and the closing.

■ In support of its position, Coldwell cites *Dryden v. Vincent D. Miller, Inc.*, 56 Wn.2d 657, 354 P.2d 900 (1960). In *Dryden*, the seller accepted the offer, retained the earnest money, and signed the earnest money receipt which contained the following provision:

> "I HEREBY AGREE to the above sale and to all the foregoing terms and conditions, and agree to pay VINCENT D. MILLER, Inc., as agent, a commission of $9000.00 for services rendered.
>
> "In the event earnest money receipted for is forfeited, one-half of same shall be retained by or paid to VINCENT D. MILLER, Inc., as agent, to the extent of commission above stated and the balance to the undersigned as owner."

*Dryden*, at 658.

The parties then entered into a contract for sale of the property, and the purchasers made a down payment of $15,000. They obtained the down payment from two lumber companies as an advance against timber to be cut and removed from the property purchased. After the buyers defaulted, the Drydens sued them, but settled the case for $1,500 and a quitclaim deed to the property. The Drydens then sued Miller to recover the $9,000 commission they had paid. The trial court held in part that the broker had not earned his commission because he breached his fiduciary duty to the sellers by not disclosing the source of buyers' down payment.

On appeal, the court reversed, holding that when the seller accepted the purchaser and agreed to pay the broker's commission for "services rendered", the broker had earned his commission. *Dryden*, at 660, 662.

As to the broker's failure to disclose its knowledge of how the purchasers raised the down payment, the court stated at page 662:

Nor does the trial court's conclusion that the appellant failed to disclose that the purchasers were obtaining the money for the down payment by advances against the timber on the land justify the judgment. The court found, upon conflicting evidence, that appellant acquired this knowledge *after* the earnest-money receipt was signed. At the time the earnest-money receipt was signed, appellant had performed its obligation to produce a purchaser acceptable to the sellers, and was then (in the absence of a finding of fraud, which is not here present) entitled to receive its commission.

The difference between *Dryden* and the case before us is that in *Dryden* the broker had earned his commission before learning about the buyers' timber advance. Here, the commission was not earned until the sale closed, and the broker's knowledge of its own guaranty preceded the closing.

Paragraph 2 of the listing agreement provides for payment of a 7 percent commission when the agent procures a purchaser on terms acceptable to the seller or the seller sells the property during the term of the agreement or within 6 months thereafter to a buyer whose attention was gained through actions of the agent. None of these conditions occurred until after Coldwell guaranteed the Bank's loan to the Johnstons.

While Coldwell also relies on *Cogan v. Kidder, Mathews & Segner, Inc.*, 97 Wn.2d 658, 648 P.2d 875 (1982), that case does not support its argument. In *Cogan*, the seller's agent found a buyer, and an earnest money agreement was signed. Before closing, the agent requested an extension of the closing on behalf of the buyer's assignee without disclosing its dual agency to the seller. The court found that the agent's fiduciary duty continued until closing.

> We agree with [defendant agent] that one of its primary responsibilities in its agency relationship was to find a purchaser . . . We disagree with [agent's] contention [that] the signing of the earnest money agreement ended its agency relationship. [Seller] included language in the earnest money agreement which conditioned [agent's] commission on "if and when the sale closes." To the extent [agent] continued to work toward closing, it continued as agent of [seller].

*Cogan*, 97 Wn.2d at 663-64. The same holds true in the present case.

In *Pilling v. Eastern & Pac. Enters. Trust*, 41 Wn. App. 158, 702 P.2d 1232, *review denied*, 104 Wn.2d 1014 (1985), the seller sued the realtor for breach of fiduciary duty in failing to monitor the closing of the sale. The *Pilling* court rejected the seller's contention that the realtor's agents had a fiduciary duty which extended beyond the earnest money agreement to the closing. The *Pilling* court distinguished *Cogan* on the basis that in *Cogan*, the earning of the commission was conditioned upon the closing of the sale. In *Pilling*, the agent simply failed to act. *Pilling* stands for the proposition that the agent's duty to act to protect the interests of the principal ends when the purpose of the agency is accomplished and the commission is earned.

Coldwell's commission was not earned until the sale closed. To the extent Coldwell was acting to close the sale, it owed an ongoing duty to the Wards until the sale closed.

## No Breach of Fiduciary Duty

The trial court concluded there was a breach of fiduciary duty by Coldwell because it guaranteed the Johnstons' loan from the Bank and did not disclose this fact to the Wards. The trial court's reasoning is set forth in its oral decision on attorney fees and states in part:

> The evidence showed that the Johnstons had been refused a loan and had no other options. The sale survived because San Juan Properties guaranteed the Johnstons' loan. Neither the Johnstons' poor credit standing nor San Juan Properties' loan guarant[y] were disclosed to the Wards by San Juan Properties, though these were clearly material facts which San Juan Properties had a duty to disclose. Failure to disclose these facts deprived the Wards of the opportunity to have the sale terminated as provided in paragraph 3; had the Wards terminated the sale, this entire lawsuit could have been avoided. While San Juan Properties argued that the Wards would have proceeded with the sale despite the Johnstons' poor credit standing and despite San Juan Properties' guarant[y] of the loan, the evidence does not show this precisely because of the fact that the Wards were deprived of the opportunity to evaluate their options in light of all the material facts.

The trial court correctly noted that the principal and agent relationship was based upon the listing agreement. However, the Wards' legal position with respect to the Johnstons'

obtaining a conventional loan must be based upon the provisions of the P&S. In that agreement, the Wards agreed to accept a down payment of $128,000 and a "2nd Note secured by a Deed of Trust for the balance due seller". The note was to be paid upon the sale of either of two other properties "of buyers", but no later than 18 months from closing.

In paragraph 3, the offer was conditioned on buyers' obtaining a conventional loan by May 21, 1990. Paragraph 3 then provides:

> If not so obtained, this agreement shall terminate and earnest money shall be refunded to Buyer.

Thus, the P&S contained two contingencies, both for the benefit of the buyers. The first was "buyers['] satisfaction of a building inspection [by] May 1, 1990" and the other was buyers' being able to obtain a conventional loan.

The issue in this case involves the conventional loan. The P&S contains no restrictions on how or from what sources buyers might obtain a loan or loans in the amount needed to close the transaction. The Wards had no contractual right to interfere in any way with the Johnstons' efforts to obtain a loan. Whether the Johnstons might require a guaranty was of no legal concern of the Wards. It follows that it made no difference whether the Johnstons obtained a guaranty of their loan from a friend, a relative, another lender, or Coldwell.

The Wards' theory, adopted by the trial court, was that Coldwell had a duty to disclose to the Wards that the Bank had initially declined to make the loan without a guaranty and that Coldwell provided that guaranty. The trial court adopted the contention that if the Wards had been fully apprised of the facts when the Bank initially declined to make the loan, the Wards could somehow have intervened and terminated the transaction. This contention is incorrect.

If, upon the Bank's initial refusal to loan, a guaranty had been obtained from some source other than Coldwell, Coldwell would have had no fiduciary duty to disclose that fact. The authorities make it clear that the duty to disclose is

limited to disclosing material facts. Although the trial court clearly referred to the Coldwell guaranty as a material fact, we believe it could not be material when there is nothing the Wards could have done about it. The Wards had the right to have the agreement terminated pursuant to paragraph 3 if the loan were not approved by a lender by May 21, 1990, and the Johnstons could not otherwise tender acceptable performance. However, the Wards had no right to interfere with the Johnstons' efforts to obtain that loan, and once the financing condition was met, the Wards were legally obligated to perform. For these reasons, the trial court's ruling in this case requires an examination of the factors that make a fact a material fact.

In *Mersky v. Multiple Listing Bur. of Olympia, Inc.*, 73 Wn.2d 225, 229, 437 P.2d 897 (1968), the court imposed a duty upon real estate brokers

> to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, . . . and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, *material* in connection with the matter for which the broker is employed, *and which might affect the principal's rights and interests or influence his actions.*

(Italics ours.)

Restatement (Second) of Agency § 391 (1958) provides that an agent is under a duty to his principal not to act on behalf of an adverse party without the principal's knowledge. Comment b under § 391 reads as follows:

> An agent can properly deal with the other party to a transaction if such dealing is not inconsistent with his duties to the principal. Thus, an agent employed to sell can properly lend money to the buyer to complete the purchase or he may "split" his commission with the buyer, unless because of business policy or otherwise it is understood that he is not to do so.

12 Am. Jur. 2d *Brokers* § 89 (1964) states in part as follows:

> It is the interests of the employer that furnish the criterion as to what information is material in the sense that it should be communicated by the broker to his employer; what is

material in one case may not be so in another. Thus, it may happen that the identity of a purchaser is not a material fact necessitating the disclosure of the name of the latter where there is nothing in the surrounding circumstances of a case to render that fact of any importance to the seller, but under different surroundings it may become of vital importance, as where the prospective purchaser has already bought an adjoining parcel of land and for that reason might be coerced into giving a higher price for the particular tract in question.

(Footnotes omitted.) From these authorities, it is clear that the broker's duty to disclose is limited to information known to the broker which the principal can use to make decisions about the transaction in which the broker is involved. Of course, one must not overlook the duty of a broker to scrupulously avoid representing any interest antagonistic to the interest of his principal as stated on page 229 of *Mersky*.

It is clear to us that Coldwell did not violate any duty to the Wards. Had the Wards learned of the guaranty and the circumstances surrounding it when it occurred, whether they liked it or not, there was nothing they could do about it.

The trial court misconstrued paragraph 3 of the P&S when it reasoned that the failure to disclose the circumstances surrounding the guaranty "deprived the Wards of the opportunity to have the sale terminated" and "deprived [the Wards] of the opportunity to evaluate their options". The Wards had no rights under paragraph 3 other than to wait until May 21, 1990, and terminate the agreement if no lender's approval had been obtained by then.

The trial court's reasoning suggests that the Wards had a right to approve or disapprove the manner in which the Johnstons proceeded in their efforts to acquire a loan. Such is not the case. The Wards' interest was limited to the end result. Thus, Coldwell's failure to disclose the guaranty and the reason for it was not a breach of a duty to the Wards.

It should be further noted that everything Coldwell did was to the Wards' advantage and furthered Coldwell's duty to provide the Wards with an able and willing purchaser. It surely is not unusual for a real estate broker to render advice and assistance to a prospective purchaser in helping to finance a purchase.

The argument was made in this case that, had full disclosure been made, the Wards could have directed Coldwell not to guarantee the loan. If we are correct in our interpretation of the effect of paragraph 3 of the P&S, then Ward did not have a legal right to so direct Coldwell, and such a direction by Ward, if followed, would have amounted to an unlawful interference with the Johnstons' performance.

■ All contracts include an implied condition that a party will not interfere with another party's performance, but will cooperate in good faith. *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 357, 662 P.2d 385 (1983); *Jones Assocs. v. Eastside Properties, Inc.*, 41 Wn. App. 462, 471, 704 P.2d 681 (1985).

The facts upon which we base this decision are undisputed. We perceive no material factual issues to prevent the entry of summary judgment in favor of Coldwell ruling that Coldwell did not breach its duty to the Wards. The judgment in favor of the Wards for return of the real estate commission in the amount of $11,200, $32,000 on the note, and $33,342.25 in attorney fees is reversed.

Coldwell contends that the Wards' loss on the note did not arise from its guaranty of the loan, but from the presence of dry rot in the house and the litigation triggered by that condition. This contention presents a legitimate issue which we shall not address due to our disposition of the issues on other grounds and for the additional reason that the record is not adequate for resolution of that issue on summary judgment.

Since the summary judgment did not dispose of all issues between these parties, the case is remanded to the trial court for further proceedings.

Reversed and remanded.

COLEMAN, J., concurs.

BAKER, J. (dissenting) — I dissent. While I agree with the majority's conclusion that Coldwell owed a continuing fiduciary duty to its principals, I disagree with the reasoning in the majority opinion leading to that conclusion. Specifi-

cally, I disagree that Coldwell's commission was unearned until closing. The commission was *earned* when Coldwell procured a buyer acceptable to seller and the purchase and sale agreement was signed. The commission was not *payable* until closing.

To illustrate this point, consider what would have happened if the transaction had not closed solely due to Wards' breach. Coldwell would be legally entitled to recover its commission from Wards, because it had earned the commission. *See White & Bollard, Inc. v. Goodenow*, 58 Wn.2d 180, 187, 361 P.2d 571 (1961). Nevertheless, a continuing fiduciary duty existed, at least to the extent that Coldwell could not act contrary to the interests of its principals, after the commission was earned and before closing. To the extent a broker continues to work toward closing, it continues to be an agent of the seller. *Cogan v. Kidder, Mathews & Segner, Inc.*, 97 Wn.2d 658, 664, 648 P.2d 875 (1982).

## I

I disagree with the majority's holding that Coldwell did not breach its fiduciary duty in failing to disclose its intent to guarantee the Johnstons' loan.[4] Coldwell breached its fiduciary duty to Wards because the loan guaranty was potentially adverse to the Wards' interest and required their consent.

Wards argue they would have preferred to let the sale to the Johnstons collapse for lack of financing and then have Coldwell locate another buyer. The Wards have solid reasons for this position. The loan guaranty did not protect them and actually made their position less secure. Coldwell's guaranty secured only the Johnstons' obligation to the bank, which was also secured by the first deed of trust on the house. The promissory note for the remainder of the purchase price was secured by a second deed of trust. The effect of the guaranty

---

[4]The majority mischaracterizes Wards' position as arguing for a duty on the part of the agent to disclose its guaranty after the fact. Wards instead argue, correctly, that their agent had a fiduciary duty to disclose its intent to guarantee *before* doing so, and to follow the directions of Wards as principals before giving the guaranty.

was to make it possible for an otherwise unqualified buyer to obtain financing. If the Johnstons became insolvent, the Wards would be left with an uncollectible promissory note. The security value of the second deed of trust would be problematical at best if the bank took conveyance on the first deed of trust. Any argument that the Wards' concern was not reasonable or that the possible harm was too speculative is refuted by the fact that, in hindsight, these unfortunate events happened.

Coldwell was therefore in a divided loyalty situation which required obtaining its principals' consent before guaranteeing the buyers' loan. Coldwell's guaranty was clearly in the buyers' interest, enabling them to obtain financing and purchase the house. Coldwell's guaranty also furthered its own interest in ensuring that its commission would be paid at closing without having to expend the effort to find another, possibly more qualified, buyer.[5] However, Coldwell was only entitled to act in its own and the buyers' interest without prior consent from its principals as long as doing so was not potentially adverse to the principals' interests. *Mersky v. Multiple Listing Bur. of Olympia, Inc.*, 73 Wn.2d 225, 229, 437 P.2d 897 (1968). It is undisputed that Coldwell's actions were taken without Wards' knowledge and consent. It follows that Coldwell breached its fiduciary duty.

The loan guaranty was material. It is correct that the purchase and sale agreement required Wards to sell the house if Johnstons were able to obtain financing. However, if the Wards became aware that they had entered into the agreement with a financially shaky buyer, they nevertheless had options which they could exercise to increase the possibility that the sale would not close. Wards' refusal to allow Coldwell to guarantee the loan might have ended the sale. Coldwell's actions deprived Wards of that option.

It is only necessary for Wards to establish that they *may* have refused to permit their agent to guarantee the buyers'

---

[5]It is not necessary to reach the issue of whether the relationship between Coldwell and Penny Johnston was sufficiently close as to create a third conflict of interest.

loan. A fact is material if it *"might* affect the principal's rights and interests *or influence his actions."* (Italics mine.) *Mersky,* 73 Wn.2d at 229. Nor is it necessary for Wards to show that Johnstons could not have obtained financing elsewhere.

> It is of no consequence . . . that the [agent] may be able to show that the breach of his duty of full disclosure and undivided loyalty . . . did not result in injury to the principal, or did not materially affect the principal's ultimate decision in the transaction.

*Mersky,* 73 Wn.2d at 231. The loan guaranty was material, as defined in *Mersky,* unless Coldwell was entitled to guarantee the loan even over Wards' potential objection. Wards never got the chance to object, to be sure, because Coldwell failed to disclose its intent to guarantee the loan. The effect of the majority's holding is to allow a real estate agent to guarantee a buyer's loan which is needed to proceed with the purchase even if the seller is informed and specifically objects to its agent's doing so.

The dispositive issue in this case is whether Coldwell needed Wards' consent *before* guaranteeing the loan. The majority's holding that the loan guarantee was not material is based on its determination that there was "nothing the Wards could have done about it". Majority opinion, at 166. The majority would agree that if the Wards' consent was required, Coldwell's failure to obtain that consent was a breach of fiduciary duty.

The majority accepts Coldwell's argument that Wards could not prevent Coldwell from guaranteeing the loan. "The Wards had no contractual right to interfere in any way with the Johnstons' efforts to obtain a loan." Majority opinion, at 165. This determination totally misstates the issue. The Wards' right to direct Coldwell's actions did not depend on whether Wards had a legal right to terminate the contract of sale. It likewise did not depend on whether "Wards had a right to approve or disapprove the manner in which the Johnstons proceeded in their efforts to acquire a loan." Majority opinion, at 167. The materiality of the loan guaranty

depends only on Wards' right to insist that their agent not act in a manner antagonistic to their interests. This right stems not from the terms of the purchase and sale agreement or the listing agreement with Coldwell, but from the fiduciary relationship which the majority concedes existed at the time. Coldwell's fiduciary duty to Wards required it to

> scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, *or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal*; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's rights and interests or influence his actions.

(Italics mine.) *Mersky*, 73 Wn.2d at 229.[6]

The majority's holding that Coldwell owed the Wards this fiduciary duty cannot be reconciled with its determination that Coldwell did not need to obtain Wards' consent. The sole reason for deciding the issue of whether Coldwell owed Wards a fiduciary duty is to determine whether Coldwell was required to inform the Wards and obtain their consent. Because Coldwell owed Wards a *fiduciary* duty to only act with their knowledge and consent, it is not necessary to find a contractual duty in the terms of the listing agreement or the purchase and sale agreement.

As a fallback position, Coldwell argues and the majority holds that Wards had no legal right to direct Coldwell not to guarantee the loan. This argument incorrectly assumes that such direction would violate a contract duty of good faith owed by Wards to the buyers. The majority relies on *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 357, 662 P.2d 385 (1983) and *Jones Assocs. v. Eastside Properties, Inc.*, 41 Wn. App. 462, 471, 704 P.2d 681 (1985), for the proposition that "[a]ll contracts include an implied condition that a party will not interfere with another party's performance, but will cooper-

---

[6]The italicized portion is deleted from the same passage in the majority opinion. Majority opinion, at 166.

ate in good faith." Majority opinion, at 168. *Lonsdale* and *Jones Assocs.* state this black letter rule but are not factually similar or applicable to this case.

Whether Wards' refusal would violate this duty is debatable. Wards were not themselves obligated to guarantee the buyers' loan nor make any other unfavorable concessions to the buyers. It follows that they were not obligated to allow their agent to make such concessions. In *Watson v. Ingram,* 70 Wn. App. 45, 851 P.2d 761 (1993), *review granted,* 123 Wn.2d 1001 (1994), a real estate seller refused to grant the buyer a few extra days to complete the financing process. Seller had obtained a better offer on the property. Seller's refusal to extend the closing date caused the first sale to collapse and forced the buyer to forfeit the earnest money. *Watson,* 70 Wn. App. at 48-49. The buyer argued that seller's refusal to extend the closing date violated the duty of good faith. This court disagreed. "By refusing to extend the closing date, [seller] was protecting his own interest in what appeared to him to be an unlikely deal. He did not breach any duty of good faith and fair dealing." *Watson,* 70 Wn. App. at 58. Likewise, Wards' decision to protect themselves from selling their house to an unqualified buyer would not have violated any duty owed to the Johnstons.

Even if Wards' refusal to allow Coldwell to guarantee the loan would violate a duty owed to the buyers, Coldwell was still required to obtain Wards' informed consent. An argument to the contrary was explicitly rejected in *Cogan.*[7] In *Cogan* the seller could not void its obligation to sell to the buyer's assignee, yet the agent still had an obligation to obtain the informed consent of the seller before acting on behalf of the buyer's assignee.

> While [seller] could have refused the extension unless he had received additional consideration, he did not. If he had been told of [agent's] conflicting relationships his response might well have been different. *While [seller] had a good faith obligation to proceed to completion of the earnest money agreement, that duty*

---

[7]Neither Coldwell nor the majority follows the duty of good faith argument to this next, necessary step.

*did not obviate [agent's] duty to inform its principal of all the options available to him in pursuit of his own interests.*

. . . .

The possibility that [seller] could have refused the extension yet still have been legally obligated to close the sale if [buyer's assignee] chose to comply with the existing closing date does not dispose of [agent's] duty to disclose its conflicting interests to [seller].

(Citation omitted.) *Cogan*, 97 Wn.2d at 665. Similarly, the fact that the Johnstons might have obtained other financing or commenced an action for violation of the duty of good faith did not relieve Coldwell of its obligation to disclose all material facts to the Wards and obtain their consent before acting on behalf of the buyers.

## II

In the event of a breach of fiduciary duty, the principal (seller) is entitled to recover any profit or commission from the agent regardless of whether the principal can show that the breach caused a loss. *Mersky*, 73 Wn.2d at 231. Because Coldwell breached a fiduciary duty to the Wards, the trial court properly awarded the Wards the return of the sales commission.

Wards were entitled to any damages which were caused by a breach of Coldwell's fiduciary duties. *See Cogan*, 97 Wn.2d at 667 (citing *Meerdink v. Krieger*, 15 Wn. App. 540, 545, 550 P.2d 42, *review denied*, 87 Wn.2d 1011 (1976)). Even assuming Wards would have not consented to the loan guaranty, there remains the question of fact as to whether the Johnstons could have obtained financing elsewhere and closed the sale. Summary judgment (for either party) on the issue of the cause of nonpayment of the promissory note to Wards was error. I would remand the issues of causation and damages for trial.

Wards were awarded attorney fees by the trial court. Attorney fees are to be awarded to the prevailing party when a contract specifically provides for fees. RCW 4.84.330. The listing agreement provides for fees in any action to enforce the agreement. I would affirm the award of attorney fees to Wards. The majority's disposition of this appeal

makes it unnecessary to determine whether Wards would be entitled to attorney fees on appeal.

Review denied at 125 Wn. 2d 1006 (1994).