957 P.2d 781 (1998)
STATE of Washington, Respondent,
v.
Russell J. TRASK and Jane Doe Trask, husband and wife; Bainbridge Marine Services, Inc., a Washington corporation; Mark A. Julian and Jane Doe Julian, husband and wife; Eagle Harbor Boatyard, a Washington corporation, Appellants.
No. 20325-1-II.
Court of Appeals of Washington, Division 2.
May 29, 1998.
As Amended on Denial of Reconsideration August 21, 1998.
*784 Romney R. Brain, Stafford Frey Cooper, Larry J. Smith, Graham & Dunn, Seattle, Kenneth F. Hobbs, Stafford Frey Cooper, David C. Lundsgaard, Graham & Dunn Pc, Michaelanne Ehrenberg, Stafford Frey Cooper, Seattle, for Appellants.
John T. Hurley, Asst. Atty. General, Anne L. Spangler, Atty. Gen. Off. Trans. Div., Olympia, for Respondent. *782
*783 MORGAN, Judge.
The State took leased land for public use. The value of the land was established at a jury trial. The lessor and lessee then moved for pre-judgment interest, reasonable attorney fees, and reasonable expert fees (for convenience, pre-judgment interest is hereafter referred to simply as "interest," and reasonable attorney fees and reasonable expert witness fees are hereafter referred to simply as "fees"). The trial court denied their motions. We affirm in part, reverse in part, and remand in part.
For many years, Russell Trask owned waterfront land at Eagle Harbor.[1] He operated a boat repair business on part of it, and leased another part of it to Mark Julian.[2]
*785 In January 1994, the State of Washington sued to take Trask's land for an expansion of its ferry maintenance facility at Eagle Harbor. It also asked Trask and Julian to stipulate to an order of immediate possession and use.[3] They agreed, and the resulting order was entered on April 1, 1994. The order stated that Trask would vacate a specified part of the land no later than August 1, 1994, and the rest no later than August 1, 1995. Julian would remain while he and the State negotiated a new rental agreement that was expected to run for about two more years. The land would be valued as of October 15, 1994, "as though the environmental contamination... has been cleaned up."[4] The State would pay $1.5 million on April 15, 1994, and another $1 million on April 15, 1995. If a trier of fact should later award more than $2.5 million in just compensation, the State would pay interest on the excess from October 15, 1994. The State would "provide and expedite" relocation benefits in accordance with RCW 8.26, and "reimbursement of attorneys' fees or witness fees [would] be determined by RCW 8.25.070."[5] If Trask failed to deliver possession as agreed, the State could remove his remaining property at his expense.
On April 1, 1994, the State paid $1.5 million into court. Trask withdrew the money that same day.
Between April and December 1994, Trask used his own employees to gradually move some of his belongings off the property. Through August 1994, he claimed relocation expenses of about $66,000, which the State paid. Near the end of August, he claimed an additional $80,000 to construct a storage building on the land to which he was moving. Doubting the reasonableness of this claim, the State ordered him not to incur further moving expenses until it could obtain bids from commercial movers. The order was issued on August 29, 1994, and rescinded on September 20, 1994. By then, the State had obtained bids, and it offered to have Trask's belongings moved commercially. It also indicated it would not reimburse Trask for more than a specified amount of moving expenses. Trask sought to bring an administrative appeal, but the State required him to wait until he had finished moving, apparently so that it could deal with all moving expenses at once.
Trask did not deliver possession on August 1, 1994. He received an extension to September 1, 1994, but he did not deliver possession on that date either. Julian and the State did not negotiate a rental agreement, and the record does not show when, if ever, Julian delivered possession.
In November 1994, the State moved for an order ejecting Trask from the land that was to have been surrendered on August 1, 1994. Trask resisted, arguing that the State had failed to find him a place to which he could move, and that he himself had been unable to find such a place. On December 5, 1994, the trial court issued the requested order, and two days later Trask delivered possession of the land affected by the order.
On April 1, 1995, the State timely paid another $1 million into court. Trask withdrew all but $300,000, which the court retained for reasons not pertinent to this appeal.
A jury trial commenced in mid-May 1995. On June 13, the jury determined that the State should pay $4.1 million as just compensation. The jury also found that Julian's share of that amount was $394,000.[6] Apparently on June 22, 1995, Trask paid $394,000 to Julian.[7]
On July 12, 1995, the court entered a partial judgment and decree of appropriation. It credited the State with $2.5 million already paid and ordered it to pay another $1.6 million. It ordered that Julian receive $394,000, *786 "which has already been distributed ... from funds previously deposited with the court."[8] It provided "that the entry of this partial judgment is without prejudice to the parties['] pursuit of claims and counterclaims for attorneys fees, interest and rent," and that "any ... supplemental judgment relating to such matters shall be separately appealable with the time for such appeal not commencing to run until the entry of such ... supplemental judgment."[9]
On July 26, 1995, the State paid another $1.6 million into court. Trask withdrew the money two days later.
On August 1, 1995, Trask failed to vacate the remainder of the land he was occupying. In September, nonetheless, he and Julian moved for interest and fees. Trask denied that he had been obligated to deliver possession by September 1, 1994 and August 1, 1995, respectively, arguing instead that he was obligated only to obey an order of ejectment, if and when the State opted to obtain one. Trask also asserted that even if he had been obligated to deliver possession by September 1, 1994 and August 1, 1995, respectively, he had been excused from that obligation when the State failed to "provide and expedite" relocation benefits.
On October 10, 1995, the trial court took evidence "on the issue of whether the State failed to perform its obligations under the [order of immediate possession and use], resulting in Trask not being able to perform his obligation to deliver possession of the property as required ... to qualify for a fee award."[10] On October 11, the trial court filed a written memorandum opinion finding, among other things, "that Trask did not deliver possession to the State ... as agreed to in the [order granting immediate possession and use]"; that Trask's delivery of possession on the dates agreed to in the order was "a condition precedent to an award of fees"; and that fulfillment of this condition had not been excused, even assuming the State had breached its agreement to provide and expedite relocation benefits.[11]
On November 1, 1995, the court filed another memorandum opinion in which it dealt with Julian's right to fees and interest. The court ruled that because "Julian was not a condemnee under the statute," he "was not entitled to an award of fees or interest."[12]
In January 1996, the court entered findings of fact and a final order. Trask and Julian then filed this appeal.
The issues on appeal are whether Trask and Julian are entitled to interest; whether Trask is entitled to fees; and whether Julian is entitled to fees. Before reaching these issues, however, we must consider certain procedural arguments raised by the State.
I.
The State makes two procedural arguments. Either, if correct, precludes the entire appeal.
A.
The State first argues that neither Trask nor Julian may now appeal because Trask, after the jury verdict, withdrew the $1.6 million excess that the State paid into court. The State bases this argument on RCW 8.04.130 and RCW 8.04.150.[13] RCW 8.04.130 provides:
Upon the entry of judgment upon the verdict of the jury or the decision of the court awarding damages, the state may make payment of the damages and the costs of the proceedings by depositing them with the clerk of the court....
In the event appellate review is sought by any party in the proceedings, the moneys paid into the superior court by the state pursuant to this section shall remain in the custody of the court until the final *787 determination of the proceedings by the supreme court or the court of appeals.
RCW 8.04.150 provides:
Either party may seek appellate review of the judgment for damages entered in the superior court within thirty days after the entry of judgment as aforesaid, and such review shall bring before the supreme court or the court of appeals the propriety and justness of the amount of damages in respect to the parties to the review: ... And provided further, that if the owner of land ... accepts the sum awarded by the jury, the court or the judge thereof, he shall be deemed thereby to have waived conclusively appellate review....

Manifestly, the Legislature's purpose in enacting RCW 8.04.130 and RCW 8.04.150 was to insure that if and when a "judgment for damages" (i.e., a judgment setting just compensation) is later reversed on appeal, the State will be able to retrieve its money. This is a concern when the judgment for damages is being attacked on appeal; it is not a concern when the judgment for damages is not being attacked on appeal. Here, the judgment for damages is not being attacked, for no one assigns error to it and the only issues are interest and fees. Accordingly, we hold that the present appeal is not barred by RCW 8.04.130 or RCW 8.04.150, even though Trask previously withdrew the money paid into court.[14]
B.
The State further argues that Trask may not bring the present appeal because he failed to appeal the December 1994 order ejecting him from part of the land.[15] Necessarily, its premises are that Trask was both permitted and required to appeal in late 1994. As a general rule, however, a party may appeal only when the trial court has finally disposed of all claims and all parties,[16] and it cannot be disputed that the December 1994 order was entered before the trial court had finally disposed of all claims and all parties. Trask had no right to appeal in December 1994, and his failure to do so does not affect his right to bring the present appeal.
II.
We turn next to the matter of pre-judgment interest. Relying on the stipulated order for immediate use and possession, Trask and Julian say they are entitled to interest on $1.6 million (the amount by which the jury's verdict of $4.1 million exceeded the State's agreed payments of $2.5 million) from October 15, 1994 to the date on which they received payment. Relying on RCW 8.04.090 and 8.04.092, the State says it is not liable for interest because Trask failed to deliver possession of the entire property until after *788 judgment had been entered. We consider (A) the effect of the statutes, (B) the effect of the stipulated order of immediate possession and use, and (C) the way in which Julian and Trask must share.
A.
The State's liability for pre-judgment interest is governed by RCW 8.04.090 and RCW 8.04.092. RCW 8.04.090 provides that the State and the condemnees may stipulate to an order for immediate possession and use; that the order shall set forth the amount the State is tendering; that the State shall pay that amount into court; and that the trial court shall then enter the stipulated order without further notice. RCW 8.04.092 provides:
The amount paid into court shall constitute just compensation paid for the taking of such property: Provided, That respondents may, in the same action, request a trial for the purpose of assessing the amount of compensation to be made and the amount of damages arising from the taking. At the trial, the date of valuation of the property shall be the date of entry of the order granting to the state immediate possession and use of the property. If... the verdict of the jury ... awards respondents an amount in excess of the tender, the court shall order the excess paid to the respondents with interest thereon from the time of the entry of the order of immediate possession....
By its terms, RCW 8.04.092 conditions the payment of pre-judgment interest on the entry of a stipulated order granting immediate possession and use. In stark contrast to RCW 8.25.070, it does not condition the payment of interest on compliance with the order or on delivery of possession. It would appear, then, that the Legislature wanted the State to pay interest from the date on which it has the right to possession, regardless of the date on which it has actual possession.
The Supreme Court adopted this view in In re City of Anacortes,[17] although not with reference to a particular statute. In Anacortes, the condemnor and a condemnee stipulated on March 19, 1969 to an order of immediate possession and use. The city condemnor did not actually take possession until sometime after April 30, 1969. When the trial court awarded interest from March 19, the city appealed. The Supreme Court affirmed, stating:
There is no finding or agreed fact as to the date the city took possession of the premises. We deem this omission to be immaterial. Under the stipulations, the city was entitled to immediate possession as if a decree of appropriation had beenentered on the date of the stipulations. Whether the city did or did not exercise its right to possession as given by the stipulations was its election. The condemnees had contractually given up the right to retain possession pending a decree of appropriation. We agree with the observation of the Supreme Court of Idaho which, after a review of the issue, stated:
The correct rule and the one which is supported by the overwhelming weight of authority, is that the condemnee should be allowed interest upon the compensation and damages awarded from the time the condemnor either takes possession, or becomes entitled to possession, of the property. [Citations omitted.]
Plaintiffs' contention that the stipulations are silent as to interest ignores the fact that it is the right to possession which creates the right to interest....
In summary, interest on the awards should commence at the date of entry of verdict ... or at such earlier date that the condemning agency becomes entitled to possession. By virtue of the stipulations, interest commenced on March 18, 1969.
Division One took the same view in State v. Hallauer,[18] a case involving RCW 8.04.090 and RCW 8.04.092. The condemnee in that case stipulated on February 7, 1979 to an order granting immediate possession and use. The stipulation was not filed, and the money was not paid, until June 7, 1979. The *789 condemnees moved for an allowance of interest from February 7, 1979, "contend[ing] that their right to interest pursuant to RCW 8.04.090 and .092 was established from the day the State became entitled to possession, i.e., February 7, 1979."[19] Agreeing, Division One said that "interest becomes payable as of February 7, 1979, the date the Hallauers stipulated to the State's immediate use and possession of the property."[20]
The State argues that a condemnee should not receive interest on the compensation paid for the land until after the condemnee has surrendered possession of the land. Because the compensation replaces the land, the State says, the condemnee should not have the use of both during the same period of time.
This argument is contrary to the plain meaning of RCW 8.04.092. Unlike RCW 8.25.070, which makes delivery of possession a condition precedent to the recovery of fees, RCW 8.04.092 does not make the delivery of possession a condition precedent to the recovery of pre-judgment interest. It provides only that "[i]f ... the jury ... awards respondents an amount in excess of the tender, the court shall order the excess paid to respondents with interest thereon from the time of the entry of the order of immediate possession." Here, then, the State's liability for interest runs "from the time of the entry of the order of immediate possession."[21]
B.
We next consider whether a condemnor and condemnee can delay, by agreement set forth in the stipulated order for immediate possession and use, the date from which interest would otherwise run by statute. We see no reason they cannot, for we perceive no public policy that would be impaired by permitting them to do so. Here, then, we conclude that the State owes interest on $1.6 million from October 15, 1994 (the date on which the parties agreed interest would start) to July 26, 1995 (the date on which the State paid the $1.6 million into the registry of the court).[22]
C.
We next consider whether Julian and Trask should divide the interest that the State must pay. We hold that they should, in proportion to the values of their interests. Julian is entitled to interest on $394,000 from October 15, 1994 to the date on which he was paid, and Trask is entitled to the balance.
III.
We turn next to whether the trial court was required to award fees to Trask. RCW 8.25.070(1) requires that a trial court award reasonable fees to a condemnee "if a trial is held for the fixing of the amount of compensation to be awarded to the owner or party having an interest in the property being condemned"; "[i]f the judgment awarded as a result of the trial exceeds by ten percent or more the highest written [settlement] offer"; and if RCW 8.25.070(3) is satisfied. RCW 8.25.070(3) provides in turn:
Reasonable attorney fees and reasonable expert witness fees authorized by this section shall be awarded only if the condemnee stipulates, if requested to do so in writing by the condemnor, to an order of immediate possession and use of the property being condemned within thirty days after receipt of the written request, or within fifteen days after the entry of an order adjudicating public use whichever is later and thereafter delivers possession of the property to the condemnor upon the deposit in court of a warrant sufficient to pay the amount offered as provided by law....[[23]]
In short, the State is liable for reasonable attorney and expert witness fees only if three *790 events occur: (1) The parties stipulate to an order of immediate possession and use; (2) the State deposits into court the agreed compensation; and (3) the condemnee "thereafter delivers possession."
The parties agree that they stipulated to an order of immediate possession and use, and that the State promptly deposited the agreed compensation into court. They disagree, however, on whether Trask "thereafter deliver[ed] possession." Trask argues (A) that he did, and (B) that even if he did not, he was excused from doing so.
A.
Trask concedes that he did not vacate the property by September 1, 1994, and August 1, 1995, respectively. At the same time, he maintains that he delivered possession as agreed in the stipulated order for immediate possession and use. His premises are (1) that a condemnor and condemnee may agree on when the condemnee will deliver possession, and (2) that a condemnee "thereafter delivers possession" by complying with such agreement. Applying these premises to the facts at hand, he then claims that he and the State agreed to conflate the act of stipulating to an order of immediate possession and use, on the one hand, and the act of delivering possession, on the other. Therefore, he says, he fulfilled his possession-related obligations when he stipulated to the order of immediate possession and use.
We agree with Trask's premises. When a condemnee and condemnor stipulate to an order of immediate possession and use, they generally agree on the date on which possession will be transferred. It should make no difference whether they manifest their agreement by accelerating or delaying the date on which they present the order for immediate and possession and use to the court for entry, or by stipulating to an order that provides for the delivery of possession on a specified date in the future. Either way, in our view, the stipulated agreement defines the condemnee's obligation to deliver possession.
We disagree with Trask's application of his premises. The trial court did not find that he or the State intended to conflate the act of stipulating and the act of delivering. On the contrary, it found that Trask did not deliver possession as the parties had agreed he would. That is a finding of fact, and it is supported by substantial evidence.[24] We conclude that Trask did not deliver possession in accordance with the stipulated order for immediate possession and use.[25]
B.
Trask argues that if he did not deliver possession as agreed, he was excused from doing so. This is true, he says, because the State prevented him from delivering possession on time by (A) ordering him to stop incurring moving expenses; (B) failing to "provide and expedite" payment of his relocation expenses; and (C) failing to share with him the use of a certain warehouse and pier.
1.
According to Trask, the State prevented him from timely delivering possession by ordering him to stop incurring moving expenses. He relies on Cavell v. Hughes, *791 which holds that "the failure or nonoccurrence of a condition will not excuse the promisor's performance if the condition's failure was the fault of the promisor,"[26] and on Refrigeration Engineering Co. v. McKay, which holds that "if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."[27]
Trask does not show that the State's order disrupted his moving arrangements for longer than the 22 days it was in effect (August 29, 1994 to September 20, 1994).[28] Moreover, he does not show that it delayed him even for 22 days, where the State, when it lifted the order, extended by 30 days his deadline for delivering possession. Even assuming the order was not justified,[29] this record will not support, much less mandate, an inference that the order prevented or hindered Trask's ability to deliver possession on time.
2.
According to Trask, the State interfered with his timely delivery of possession by not providing and expediting relocation assistance benefits. Before we can resolve this claim, we must analyze its nature.
Every contract contains an implied covenant of good faith and fair dealing.[30] This covenant casts on each party a duty not to interfere with the other party's performance.[31] It does not, however, cast on either party a duty to affirmatively assist in the other party's performance.[32] Although a party has a duty not to interfere with the other party simply because a contract is formed, a party has no duty to affirmatively assist the other party in the absence of an express or implied promise to that effect.[33]
Trask attempts to characterize the State's failure to pay relocation benefits as a breach of its duty not to interfere; such failure, he says, "substantially interfered with [his] ability to move off the property in a timely fashion" and "excused [his] failure to meet the deadlines contained in" the stipulated order.[34] In reality, however, he is claiming that the State affirmatively promised to help him move by providing and expediting relocation benefits; that the State breached its promise to that effect; and that because of the State's breach, he was excused from performing his duty to deliver possession on the dates set forth in the stipulated order. Without so holding, we assume he is right in asserting that the State promised to pay relocation benefits and then breached its promise. The question, then, is whether the assumed breach excused him from performing his duty to deliver possession on time.
The nonperformance (breach) of a promise made by A does not necessarily excuse the performance of a different promise made by B. If A's performance of one promise is not a condition precedent to B's performance of a different promise, A's nonperformance *792 (breach) renders A liable for damages; it does not, however, excuse B's performance of the other promise.[35] When A's performance of one promise is a condition precedent to B's performance of another promise, A's nonperformance (breach) renders A liable for damages, and it also excuses B's performance of the other promise.[36] Whether A's performance of one promise is a condition precedent to B's performance of another promise depends on the intent of the parties; as the Supreme Court has said:
Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances.[[37]]
If the intent of the parties is doubtful, a promise should not be construed as a condition.[38]
At least implicitly, the trial court ruled that the State's payment of relocation benefits was not a condition precedent to Trask's delivery of possession. It said in its first memorandum opinion:
... [T]he last issue presented is whether Trask should be legally required to [deliver possession] ..., if the State did not provide assistance and expedite the award of relocation assistance benefits to Trask....
The Order [of immediate possession and use] is silent as to any remedies for breach of the party's agreement.... There has been no case law provided to the Court nor any legal argument to support the proposition that a party should be excused from a mandatory statutory requirement based on... a breach of anagreement [] which does not in any manner attempt to relieve a party of such statutory mandate.... Based on [Trask's] failure to deliver possession of the property on September 1, 1994 and August 1, 1995, he does not qualify for either an award of attorney fees or expert fees....[[39]]
We agree with this assessment. The relocation benefits statute, RCW 8.26.035, clearly contemplates reimbursement instead of, or at least as an alternative to, advancement. Trask testified at length in an evidential hearing convened by the trial court, but he never claimed that the State was to pay relocation benefits before he delivered possession. The parties' stipulated order states only that Trask and Julian "shall have the right to relocation assistance benefits provided by RCW 8.26,"[40] and that the State shall "expedite" such benefits; it notably does not say that the State's payment of such benefits is a condition precedent to Trask's delivery of possession, or even that the State is promising to pay such benefits before Trask delivers possession. These omissions loom large in light of the fact that all parties were represented by counsel when the order was drafted and signed; if counsel had intended to make the State's payment of relocation benefits a condition precedent to Trask's duty to move, they could easily have done so. Concluding that the evidence is insufficient to support a finding that the parties intended the State's payment of relocation benefits to be a condition precedent to Trask's delivery of possession, we hold that the State's failure to pay relocation benefits, even if a breach, did not excuse Trask from delivering possession on the dates set forth in the stipulated order.
3.
According to Trask, "the State reneged on its assurances that it would allow reasonable concurrent use of the long pier and the warehouse."[41] He does not attempt to show that this conduct caused delay, or that permitting him to use the warehouse *793 and pier was a condition precedent to his duty to deliver possession on time. Rather, he argues only that the State's conduct "was particularly egregious in light of the fact that Trask had already demonstrated his willingness to honor the reasonable concurrent use provision in the Amended Stipulation by allowing the State to store the ferry wing walls on his property."[42] This does not show that the unavailability of the warehouse and pier caused or contributed to a delay in moving, nor does it show that the availability of the pier and warehouse was a condition precedent to his timely delivery of possession. We conclude that the State's alleged refusal to allow use of the pier and warehouse did not excuse Trask's failure to deliver possession on the dates set forth in the stipulated order, and that Trask is not entitled to fees under RCW 8.25.070.
IV.
We turn next to whether the trial court was required to award fees to Julian. The trial court ruled he was not entitled to fees because he is not a condemnee. The State limply tries to defend that position,[43] but its main arguments are that Julian did not deliver possession on time and, even if he did, that he is not entitled to fees incurred to apportion his and Trask's interests (as opposed to fees incurred to set just compensation).
A.
As just noted, the trial court ruled that Julian was not a condemnee for purposes of setting just compensation, or for purposes of awarding reasonable attorney fees. The court reasoned that Julian's "leasehold with Trask was terminated on April 1, 1994, when Trask granted to the State a right of immediate use and possession,"[44] and thus that Julian had no right to fees under RCW 8.25.070.
This reasoning is erroneous. Unless a lessee agrees otherwise, he or she is entitled to just compensation when the State takes all or part of the leased land for public use.[45] A lessee agrees otherwise if the lease provides that the lessor will receive the entire condemnation award unconditionally, or on the occurrence of events that actually come to pass.[46] A lessee also agrees otherwise if the lease provides that he or she will receive a share of the award only on the occurrence of events that do not come to pass.[47] A lessee does not agree otherwise merely because the State's taking extinguishes the lease; because the State's taking always extinguishes the lease, or at least part of it, a contrary rule would effectively eliminate every lessee's constitutional right to compensation.
Here, the Trask-Julian lease provided in part:
If more than twenty-five (25) percent of the Leased Premises, including the Tenant Improvements, shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, then the tenant shall have the right, at its option, to terminate this Lease upon sixty *794 (60) days written notice. In the event of any such taking or appropriation, the Landlord shall be entitled to any and all awards and/or settlements from such authority which relates to the compensation for raw land and the Tenant shall be entitled to any and all awards and/or settlements relating to the Tenant improvements. Neither party shall have any claim against the other for the value of any unexpired term of this Lease.[[48]]
As these provisions make clear, Julian did not agree to forego compensation for his leasehold interest; on the contrary, he and Trask agreed that he would receive "any and all awards and/or settlements relating to the tenant improvements." Nor did Julian ever exercise his option to terminate the lease due to the State taking the land. We hold that Julian was a condemnee, and that he may not be denied fees on the ground relied upon by the trial court.
B.
The State argues that even if Julian was a condemnee, he is not entitled to fees because he did not satisfy all three conditions set forth in RCW 8.25.070 for recovering fees. As noted above, those conditions are (1) the condemnee's stipulating to an order of immediate possession and use; (2) the State's depositing into court the agreed upon compensation; and (3) the condemnee's "thereafter deliver[ing] possession." It is undisputed that Julian joined in the stipulated order for immediate possession and use, and that the State deposited the agreed amount of money into court; thus, the only issue is whether Julian delivered possession in accordance with the stipulated order for immediate possession and use.
Although this is an issue of fact, the trial court declined to consider or resolve it. The stipulated order shows that Julian was not required to deliver possession on the date it was entered, for it states he will remain in possession while he and the State negotiate a new two-year rental agreement. The stipulated order does not show, however, when he was required to deliver possession. On remand, the trial court shall determine the date, if any, on which Julian agreed to deliver possession, and whether he substantially complied with whatever agreement he made. If he did, he is entitled to fees; otherwise, he is not.
C.
The State contends that even if Julian is entitled to some fees, he is not entitled to fees incurred to apportion his interest from Trask's. This contention requires a basic understanding of Washington's statutory condemnation scheme.
The compensation portion of Washington's condemnation scheme has two stages.[49] In the first stage, the object is to ascertain a lump sum that the State must pay in exchange for taking the land. All parties interested in the land may participate,[50] but the land is valued as if "but one estate," "without regard to subdivisions of interest by which the subject is affected through the various contracts of individual owners."[51] That value is the "just compensation" the State must pay for "the land as a whole"[52] and, once the State pays, it takes the land and is dismissed from the action.[53] In the second stage, the object is to apportion the amount paid by the State among the various condemnees, in such a way that the State's money fairly substitutes for the interest of which each condemnee has been deprived.[54]
*795 The question here is whether the Legislature, when it enacted RCW 8.25.070, imposed on the State the obligation to pay fees incurred in both stages, or only the obligation to pay fees incurred in the first stage. Although the statute exhibits extremely poor draftsmanship, it seems to indicate that the Legislature intended only to impose fees incurred in the first stage. Otherwise, it would require he State to pay fees incurred in the State's absence, without an opportunity for the State to be heard on the reasonableness of such fees. On remand, the trial court shall award fees incurred to establish just compensation, but not fees, if any, incurred solely to apportion such compensation between Trask and Julian. We emphasize, however, that fees incurred to establish just compensation include fees paid to produce evidence relevant in any way to the amount of just compensation.[55]
In conclusion, we reverse the orders denying pre-judgment interest to Trask and Julian. We affirm the order denying fees to Trask. We vacate the order denying fees to Julian, and his case is remanded for further proceedings on that issue. We deny Trask an award of fees on appeal. Julian's right to fees on appeal shall abide the outcome of the hearing on remand. If the trial court later awards Julian all or part of the fees he incurred at trial, it shall award him a similar proportion of the fees he reasonably incurred on this appeal.
SEINFELD, and HUNT, JJ., concur.
NOTES
[1] Parties associated with Trask include a trust and a corporation called Bainbridge Marine Services, Inc. For convenience, we refer only to Trask.
[2] Parties associated with Julian include Diane Hutchings and a corporation called Eagle Harbor Boatyard, Inc. For convenience, we refer only to Julian.
[3] See RCW 8.25.070.
[4] Clerk's Papers at 44.
[5] Clerk's Papers at 17, 46.
[6] Perhaps for reasons of judicial economy, the trial court instructed the jury to value Julian's interest at the same time as it was determining the total amount to be paid by the State. No one assigns error to this procedure, and we have no occasion to consider whether the trial court had discretion to utilize it.
[7] We take this date from the trial court's memorandum opinion. See Julian's Clerk's Papers at 141.
[8] Clerk's Papers at 553.
[9] Clerk's Papers at 553-54.
[10] Clerk's Papers at 744.
[11] Clerk' Papers at 742-45.
[12] Clerk's Papers at 748.
[13] The State also relies on State v. Wachsmith, 4 Wash.App. 91, 92, 479 P.2d 943 (1971). The proposition considered in that case was whether the State could simultaneously appeal awards of just compensation and fees. That proposition is not in issue, thus Wachsmith has no impact here.
[14] Parenthetically, this result is consistent with RAP 2.5(b)(1)(iii). Because of it, we need not address Trask's argument that the Rules of Appellate Procedure supersede RCW 8.04.150. See RAP 2.5(b)(1); RAP 18.22(b); compare RAP 18.22(a), first sentence, with RAP 2.5(b)(3).
[15] The State says this is an application of `the law of the case' doctrine. We ignore that label in the belief it is being wrongly used. See RAP 2.5(d). Properly used, the label refers to the principle that appellate court determinations bind the trial court on remand; to the principle that jury instructions not objected to govern the case; and to the principle that an appellate court will generally not redetermine a rule of law which it announced, or which was necessarily implicit in, a prior determination of the same case. Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 113, 829 P.2d 746 (1992); see also State v. Worl, 129 Wash.2d 416, 424, 918 P.2d 905 (1996); Fluke Capital & Mgmt. Svcs. Co. v. Richmond, 106 Wash.2d 614, 620, 724 P.2d 356 (1986).
[16] RAP 2.2(d); CR 54(a); Fox v. Sunmaster Products, Inc., 115 Wash.2d 498, 505, 798 P.2d 808 (1990); Doerflinger v. New York Life Ins. Co., 88 Wash.2d 878, 567 P.2d 230 (1977); Matson v. City of Tacoma Civil Svc. Bd., 75 Wash.App. 370, 377, 880 P.2d 43 (1994); Pepper v. King County, 61 Wash.App. 339, 344-45, 810 P.2d 527 (1991). Exceptions exist if the trial court enters the findings set forth in CR 54(b), RAP 2.2(d), or if an appellate court grants discretionary review, RAP 2.3(a), but neither of those exceptions applies here.

State ex rel. Biddle v. Superior Court, 63 Wash. 312, 115 P. 307 (1911), relied on by the State, is consistent with the rule stated in the text. As far as the Biddle opinion shows, the appellant was attempting to attack, by writ of prohibition, a writ of assistance issued after the trial court had entered judgment finally disposing of all claims and all parties. One of the holdings was that a party could appeal a writ of assistance issued under those circumstances.
[17] In re City of Anacortes, 81 Wash.2d 166, 169, 500 P.2d 546 (1972).
[18] State v. Hallauer, 28 Wash.App. 453, 455-56, 624 P.2d 736 (1981).
[19] Hallauer, 28 Wash.App. at 455, 624 P.2d 736.
[20] Hallauer, 28 Wash.App. at 457, 624 P.2d 736.
[21] RCW 8.04.092.
[22] In the trial court, the State argued "that the stipulated order for immediate use and possession is ... a valid contract between the State and the owner, as well as a valid order entered by the Superior Court." Clerk's Papers at 333; see also Clerk's Papers at 77. In this court, it argues that such an order is not also a valid contract. Br. of Resp't at 26-27. As the text indicates, we accept its earlier position.
[23] Italics added.
[24] We reject Trask's argument that we should review de novo (i.e., without deference to the trial court's findings). The nature of the parties' agreement is a question of fact, Chatterton v. Business Valuation Research, Inc., 90 Wash.App. 150, 951 P.2d 353, 356 (1998) (quoting In re Marriage of Boisen, 87 Wash.App. 912, 920-21, 943 P.2d 682 (1997)); Scott Galvanizing, Inc. v. Northwest EnviroServices, Inc., 120 Wash.2d 573, 582, 844 P.2d 428(1993) (citing Berg, 115 Wash.2d at 668, 801 P.2d 222); Marriage of Ferree, 71 Wash.App. 35, 43, 856 P.2d 706 (1993) ("The existence and material terms of an agreement are a question of fact."), and we review questions of fact for substantial evidence. Chatterton, 951 P.2d at 356.
[25] We do not overlook Trask's reliance on a "presumption" from a 1908 case called Goss v. Northern Pac. Hosp. Ass'n of Tacoma, 50 Wash. 236, 239, 96 P. 1078 (1908). Assuming without holding that this turn-of-the-century "presumption" has survived the ensuing nine decades, it is today nothing more than an aid to determining the intent of the parties. See Berg v. Hudesman, 115 Wash.2d 657, 667, 801 P.2d 222 (1990). Because the trial court did not find an intent to conflate the requirements of stipulation and delivery, and because it was not required to do so in light of the evidence produced in the trial court, Goss has no effect here.
[26] Cavell v. Hughes, 29 Wash.App. 536, 539, 629 P.2d 927 (1981).
[27] Refrigeration Eng'g Co. v. McKay, 4 Wash.App. 963, 969-70, 486 P.2d 304 (1971) (quoting 5 Samuel Williston, Contracts 677, 224, 225 (3d ed. 1961)).
[28] Trask's entire argument on this point is that the State's order "affirmatively denied [him] a significant portion of the time that he had originally estimated his move would take." Br. of Appellant Trask at 38. The evidence shows that Trask was using his own employees to make the move, and it seems obvious they were available before, during, and after the 22-day period under discussion here.
[29] We do not address whether the State's order was justified or unjustified.
[30] Badgett v. Security State Bank, 116 Wash.2d 563, 569, 807 P.2d 356 (1991); Lonsdale v. Chesterfield, 99 Wash.2d 353, 357, 662 P.2d 385 (1983); Ward v. Coldwell Banker, 74 Wash.App. 157, 168, 872 P.2d 69, review denied, 125 Wash.2d 1006, 886 P.2d 1133 (1994); Cavell, 29 Wash.App. at 539, 629 P.2d 927.
[31] Lonsdale, 99 Wash.2d at 358, 662 P.2d 385; Ward, 74 Wash.App. at 168, 872 P.2d 69. We have no occasion to consider whether the covenant has other effects as well.
[32] Badgett, 116 Wash.2d at 569-70, 807 P.2d 356.
[33] Badgett, 116 Wash.2d at 569-70, 807 P.2d 356.
[34] Br. of Appellant Trask at 38.
[35] Ross v. Harding, 64 Wash.2d 231, 236, 391 P.2d 526 (1964).
[36] Ross, 64 Wash.2d at 236, 391 P.2d 526.
[37] Ross, 64 Wash.2d at 236, 391 P.2d 526; Jones Assoc., Inc. v. Eastside Properties, Inc., 41 Wash. App. 462, 466-67, 704 P.2d 681 (1985).
[38] Id.
[39] Clerk's Papers at 756 (italics added).
[40] Clerk's Papers at 46.
[41] Br. of Appellant Trask at 39.
[42] Br. of Appellant Trask at 39.
[43] The State says we should uphold the trial court's ruling because Julian has not made appropriate assignments of error. At the same time, however, it acknowledges that Julian "is entitled to a share of the condemnation award in accordance with its interest in the property arising out of its contract with Trask." Br. of Resp't at 35. We think Julian's assignments of error are adequate.
[44] Clerk's Papers at 747-48.
[45] Spokane Sch. Dist. v. Parzybok, 96 Wash.2d 95, 98, 633 P.2d 1324 (1981) (calling it "unquestioned" that a lessee's interest is cognizable in a condemnation proceeding); State v. Spencer, 90 Wash.2d 415, 420, 583 P.2d 1201 (1978) (describing division of award under the Restatement (Second) of the Law of Property 8.2 (1977), when a taking terminates a lease); Smithrock Quarry v. State, 60 Wash.2d 387, 391, 374 P.2d 168 (1962) (awarding condemnation damages to the holder of an assignment of lease); State v. Meador, 60 Wash.2d 543, 545, 374 P.2d 546 (1962) (finding lessee who assigned interest but retained right of re-entry was entitled to share in condemnation award when failure to pay rent preceded the award); State ex rel. Long v. Superior Court, 80 Wash. 417, 422, 141 P. 906 (1914).
[46] State v. Sheets, 48 Wash.2d 65, 68, 290 P.2d 974 (1955).
[47] State v. Farmers Union Grain Co., 80 Wash. App. 287, 293-94, 908 P.2d 386 (1996).
[48] Ex. 130, paragraph 21.
[49] Spencer, 90 Wash.2d at 419-20, 583 P.2d 1201; Farmers Union Grain Co., 80 Wash.App. at 292-93, 908 P.2d 386.
[50] See RCW 8.04.080.
[51] Long, 80 Wash. at 420-21, 141 P. 906 (quoting Cornell-Andrews Smelting Co. v. Boston & P.R. Corp., 209 Mass. 298, 95 N.E. 887, 889 (1911)).
[52] Long, 80 Wash. at 421, 141 P. 906 (quoting Cornell-Andrews Smelting, 95 N.E. at 889).
[53] RCW 8.04.130.
[54] Long, 80 Wash. at 421, 141 P. 906 (quoting Edmands v. City of Boston, 108 Mass. 535 (1871); see Spencer, 90 Wash.2d at 421-22, 583 P.2d 1201).
[55] See ER 401. Thus, if the value of Julian's interest was a factor for the jury to consider in establishing just compensation for the land as a whole, Julian is entitled to the fees he incurred to produce evidence showing the value of his interest.